760 A.2d 725

**STATE of Maryland**

v.

**Alvin Winslow GROSS.**

**No. 916, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Oct. 12, 2000.

530

534

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Frank Weathersbee, State's Atty. for Anne Arundel County, Annapolis, on the brief), for appellant.

Fred Warren Bennett (Michael E. Lawlor and Bennett & Nathans, LLP, on the brief), Greenbelt, for appellee.

Argued before MOYLAN, EYLER and STEPHEN P. JOHNSON (Specially Assigned), JJ.

MOYLAN, Judge.

"In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

... The Sixth Amendment

"The right to counsel is the right to the effective assistance of counsel."

... *McMann v. Richardson,* 397 U.S. 759, 771 n.14, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)

At the end of a seven-day trial on December 8, 1994, the appellee, Alvin Winslow Gross, was convicted by an Anne Arundel County jury of 1) first-degree murder, 2) first-degree rape, 3) kidnapping, and 4) the use of a handgun in the commission of a crime of violence. He was sentenced to life without the possibility of parole for murder, 25 years concurrent for rape, 25 years concurrent for kidnapping, and 15 years concurrent for the handgun violation.

In an unreported opinion, this Court 1) held that the evidence was insufficient to sustain Gross's kidnapping conviction, 2) ordered the rape conviction merged into the first-degree felony murder conviction, and 3) affirmed the murder and handgun convictions. *Gross v. State,* No. 501, Sept. Term, 1995, 108 Md.App. 720 (filed 2/26/96). A Petition for a Writ of *Certiorari* was denied by the Court of Appeals. 343 Md. 333, 681 A.2d 68 (1996). On August 18, 1997, Gross filed a Petition for Post–Conviction Relief in the Circuit Court for Anne Arundel County. In that petition, he cited numerous actions by his attorney which allegedly constituted ineffective assistance of counsel at both the trial and appellate levels.[1] A hearing was held on the petition and on June 7, 1999, the Circuit Court filed a 37–page Memorandum Opinion and Order granting Gross a new trial. In that Opinion, the hearing judge found:

---

1. The same attorney represented Gross both at his trial and on his direct appeal.

1. that trial counsel was ineffective for failing to object to the use of DNA PCR testing;

2. that trial counsel was ineffective for failing to investigate, hire, and properly prepare a qualified competent expert in the field of DNA PCR testing;

3. that trial counsel was ineffective for failing to object to the introduction of DNA PCR evidence absent required population genetics statistics;

4. that the cumulative effect of trial counsel's errors denied Gross effective assistance of counsel;

5. that appellate counsel was ineffective for failing to appeal the trial court's ruling on the Motion to Suppress the DNA PCR evidence; and

6. that appellate counsel was ineffective for failing to raise on direct appeal the trial court's refusal to accept Dr. Walter Rowe as an expert in DNA PCR evidence.

The State challenges each of those six findings. We will, however, restructure the issue before us. The first three of those findings constitute, collectively, the basis for the Circuit Court's ruling that Gross was unconstitutionally denied the effective assistance of trial counsel. The so-called fourth "finding" is nothing more than a legal conclusion based on the cumulative effect of the preceding three actual findings. The correctness of that ruling as to the ineffectiveness of trial counsel is one of the two issues before us for decision.

The final two findings constitute, collectively, the basis for the Circuit Court's ruling that Gross was unconstitutionally denied the effective assistance of appellate counsel. The correctness of that ruling is the second issue before us for decision.

## THE FACTUAL BACKGROUND

### A. The *Corpus Delicti*

At approximately 6:45 A.M. on Sunday morning, December 19, 1993, a resident of Southern Anne Arundel County was returning to his home after having driven to the nearby town

of Deale to pick up a Sunday paper and some doughnuts. In a rural cornfield near Leitch Road, he spotted what appeared to be a lifeless human body. After summoning help from a nearby farm, he confirmed that what he had spotted was the body of a human female. He called 911.

Although not identified for several days, the body was that of Margaret Ruth ("Peggy") Courson, a 26–year–old woman living in a boarding house near the City Dock in Annapolis, although her parents and her three-year-old child lived in Florida. She suffered from acute alcoholism and the autopsy revealed that her blood alcohol content was .34%. The blood alcohol content of the urine was .42%. When her body was found, she was nude from the waist up, her underpants were wrapped around one leg; she had on no shoes, no blouse, no bra, and no coat. She had, moreover, no purse nor any other indication of her identity. When a picture of her unidentified body ran in the local newspaper, a friend recognized it as "Margaret Courson." The cause of death was four gunshot wounds, all at close range, two to the neck and two to the chest.

Subsequent investigation revealed that Peggy Courson had been denied entrance to her apartment house at approximately 2 A.M. by her landlady because of her drunken condition. As a bartender was leaving Armadillo's in the City Dock area after closing up at approximately 3:30 A.M., he encountered Peggy Courson, who appeared to be very confused and very drunk. When he last saw her, she was wandering off "aimlessly," in the direction of Middleton's Tavern. He was the last person, other than her murderer or murderers, known to have seen her alive. The cornfield where Peggy Courson's body was found three hours later was approximately twenty miles away from the City Dock area of downtown Annapolis.

Twenty-five days were to go by before the rest of Peggy Courson's clothing was found. On January 13, a south Anne Arundel County farmer discovered some suspicious items in a field between his house and his barn and immediately called police. At a spot in a field approximately fifty feet from

Sudley Road, an Anne Arundel County officer discovered a pair of fur-lined black boots belonging to Peggy Courson. Near the boots was a black suede or cowhide purse. In the purse were, *inter alia,* a pair of white socks, a brassiere, and a blouse. The field in which these personal items were found was located approximately five miles from where Peggy Courson's body was found.

Thus far, the evidence described was offered to prove the *corpus delicti* of the crimes committed against Peggy Courson and was largely undisputed.

### B. Investigative Focus

Initially there was nothing that pointed to any particular person as the criminal agent. Ultimately, there was abundant evidence to establish the criminal agency of Gross. To place that evidence of criminal agency in context, however, it will be helpful, as it was in the opinion of this Court resolving Gross's direct appeal, to go outside of the evidence offered on the merits of guilt or innocence and to look at the application for a series of search warrants sworn to by Detective Keith D. Williams and admitted at the pre-trial hearing.

In response to media releases on December 20, 1993, the day after Peggy Courson's body was found, the police received several telephone calls identifying Gross as the murderer. On December 31, they received another anonymous call stating that Sidney Scott, Jr. and two other black males were involved in the murder. On January 6 and 7, 1994, the police spoke to three persons, unidentified by the police in the warrant application. Two of those persons informed them that Gross had committed the murder with Sidney Scott present. The third of those informants implicated the appellant and two other named persons.

Based on information provided by Scott and by the unidentified informants, the police obtained search warrants for Gross's person, his car, and his residence, all of which were executed on January 10. Gross was also arrested and transported to the police station where, upon the advice of counsel,

he refused to make a statement. Samples of Gross's blood, hair, and saliva were obtained and were submitted to the crime laboratory.

## C. The Physical Evidence From Gross's Car

The evidence establishing Gross's criminal agency fell into five categories: three of them extremely strong, one of more marginal strength, and one of peripheral significance. Any of the three strong categories would have been enough, standing alone, to satisfy the State's burden of production. Whether the fourth category, standing alone, would have constituted a *prima facie* case is more problematic. The fifth category, standing alone, would clearly not have constituted legally sufficient evidence to take the case against Gross to the jury.

The first extremely strong category of proof consisted of physical evidence found in the January 10 search of Gross's automobile. It unequivocally placed the victim, Peggy Courson, in Gross's car. Some of it, moreover, circumstantially placed her in Gross's car at a time close to her death.

Behind the back seat, between it and the hatchback area, was found a notebook. The handwriting in the notebook matched that of Peggy Courson. On nine separate pages of the notebook, moreover, were found Peggy Courson's fingerprints. An FBI hair and fiber expert testified that two of Peggy Courson's head hairs were found in the automobile. There was also in Gross's automobile one of Peggy Courson's pubic hairs. The notebook and the three hairs from the body of Peggy Courson were strong evidence that she had been in Gross's automobile, although they could not establish how recent that presence had been.

The FBI expert also testified, however, as to various carpet fibers from the floor mats of Gross's automobile and also as to fibers from a blanket found in Gross's automobile that were found on various items of clothing worn by Peggy Courson. Those fibers did more than establish her presence in the automobile at some undesignated time. Significantly, the fibers were found on articles of clothing worn by Peggy

Courson on the night of her death. Fibers were found on Peggy Courson's coat, on her jeans, and on her panties, all of which were found along with her body. It was the coat she was wearing on the night she died. They were the jeans she was wearing on the night she died. They were the panties she was wearing on the night she died. Carpet fibers from the car were also found in the combings of her pubic hair. Fibers were also found on three of the items of her clothing found twenty-five days later and five miles away: on her boots, on her socks, and on her blouse. They were the boots she was wearing on the night she died. They were the socks she was wearing on the night she died. It was the blouse she was wearing on the night she died.

### D. The Confession to Troy King

Devastating proof of Gross's guilt was the unsolicited confession he made to Troy King. Troy King was a young man without a criminal record, had been a close personal friend of Gross's for approximately seven years, and was not in any way a suspect in the case. As "best friends," he and Gross got together socially "one or two days a week," and talked on the phone at least several times a week. At sometime after Christmas but before New Year's Eve, Troy King called Gross. King described how Gross began the conversation by saying that "he was doing crazy things lately." Gross read to King a newspaper article describing Peggy Courson's murder. King testified that Gross "told me that him and Sidney were involved in it." King testified to the core of Gross's incriminating conversation:

> I talked to him on the telephone, and he had told me that he had did some strange things lately. And I had asked him what, and he had said that him and Sidney [Scott] had went out one night, riding around, and he was at a pay phone in Annapolis, and there was a drunk lady or whatever Sidney had got to talking to and got her in the truck while he was on the pay phone. And then after he got off the pay phone, he got in the truck, and him and Sidney drove around with her.

Q: Okay. And what else did he say about that night?

A: That they rode around for awhile. They got to some road, he didn't say, and he was going to let her out, and supposedly Sidney shot her first and then Alvin [Gross] said that he shot her next.

Q: And did Alvin say anything about why he shot her?

A: He told me that he felt like he had to.

Q: And why did . . . did he explain that to you?

A: Because that . . . they was riding around and that Sidney was in the back seat with her, and that . . . he was forcing [himself] on the girl, whatever . . .

Q: And what . . . what do you mean by that?

A: As far as sex.

Q: Okay.

A: And that she knew, you know, [that] Alvin had drove, had knew his name, 'cause Sidney had said it, and he felt like he had to.

Q: And did he say why he felt he had to kill her?

A: Because if he didn't that she could go back to the cops or whatever and say that they had picked her up, and Sidney had raped her or whatever, and they could have got in trouble for it. Or Sidney had shot her also, and it could be attempted murder.

Q: So Alvin felt he had to do what?

A: Kill her.

Q: Did Alvin say where he left the body?

A: No.

### E. Gross's Testimonial Acknowledgment of Contact With the Victim

Gross could not leave unchallenged the undisputed evidence from the FBI's hair and fiber examiner that Peggy Courson had been in his automobile. He took the stand in his own defense and his testimony, though intended to be exculpatory, was heavy with inculpatory potential. His taking of the stand

was a desperate but necessary effort to put some kind of exculpatory spin on that evidence.

The gist of Gross's testimony was that he picked up Peggy Courson, that she was in his car for several hours, and that they had consensual sexual intercourse, but he placed those events as having occurred on the Friday night/Saturday morning of December 17/18, 1993, a full twenty-four hours before Peggy Courson was murdered. He acknowledged that he had never, before the night of December 17/18, had a date with Peggy Courson and that she had never before been in his automobile. He could not even testify to any actual contact with her before that night. He indicated, however, that he had heard others "talk about her" and knew something about her general reputation.

Gross's story was that on that Friday night he had attended a local basketball game and then met with a number of friends at a McDonald's restaurant in Edgewater in suburban Annapolis. After leaving his friends, he drove around looking for some other acquaintances with no success. Shortly after midnight, he was still "cruising" the streets of Annapolis because he did not yet want to go home and go to bed. It was at that point that he spotted Peggy Courson, whom he knew by sight at least, walking near West Street, a few blocks away from the City Dock area.

He initiated conversation with her and she got into his car. He could tell that she was clearly drunk. He drove her to a wooded area several miles north of Annapolis. They there proceeded to drink "a few beers." She ultimately invited him into the back of his car "to show her appreciation." By the time he joined her in the back of the car, she was naked. She initially performed fellatio on him. They then engaged briefly in sexual intercourse, but he soon lost interest. At her request, he then returned her to the area of the Annapolis City Dock and dropped her off.

Recognizing the unquestioned prerogative of a jury to reject a story in part but to accept it in other part, we note that it would have been very easy for the jury in this case simply to

have transferred Gross's inculpatory acknowledgments from the wee hours of Saturday morning to the wee hours of Sunday morning. Although he knew of Peggy Courson as a young and alcoholic woman wandering the streets of Annapolis, he was, in effect, a stranger to her. He testified that at a time shortly before her death he picked her up, drove her in his car to a secluded wooded area, and had sexual intercourse with her. Those were damning admissions, notwithstanding his effort to distance that acknowledged conduct from the time of the murder by twenty-four hours.

Gross's acknowledged conduct of early Saturday morning fits easily into the scenario of what probably preceded the murder of early Sunday morning. A young and very drunken woman wandering empty streets in the wee hours of a winter morning is easily identifiable and helpless prey on any day of the week. To "pick her up" for sexual exploitation would be easy on either of the weekend mornings. To drive her to a deserted wooded area would be the logical next step. Putting aside his possibly self-serving testimony as to the day of the week, Gross's acknowledged actions were compatible with the likely pre-murder scenario.

The physical evidence as to where the fibers from Gross's automobile were found on the body and on the clothing of Peggy Courson on Sunday morning makes her presence in the automobile on Saturday morning instead of Sunday morning highly improbable. For the carpet fiber to have been in her pubic hair since early Saturday morning would essentially have required that she neither bathed nor showered between Friday night and Saturday night. For the carpet fibers to have been on her clothes since early Saturday morning would have required that between Friday night and Saturday night she had not changed her blouse, her socks, or her panties, let alone her jeans, her shoes, and her coat. Her landlady testified that she was at home until 11 o'clock on Saturday night.

Collectively, the fibers on six different categories of clothing indicated that between the time she was in Gross's automobile

and the time she died, Peggy Courson had not changed any of those six articles of clothing. The jury, putting the pieces together for itself, obviously believed a lot of what Gross said, but believed it happened twenty-four hours later than he said it happened.

## F. The Possible Murder Weapon and a Further Admission

A fourth category of proof was significantly damaging, although no ultimate ballistic "match" could be made. Four bullets were taken from the body of Peggy Courson. The firearms identification expert for the Maryland State Police Crime Laboratory testified that they were so mutilated from having passed through bony tissue that they were not susceptible to standard ballistic identification comparisons. He was nonetheless able to testify that they were .32 caliber bullets of a type that would be fired from a revolver made by one of five probable manufacturers. One of those manufacturing companies would be Rossi.

The police ultimately recovered from Troy King a Rossi revolver, which had been turned over to him by Gross in early January of 1994. Although the ballistics examiner could not say that the four bullets in question had been fired by Gross's revolver, he did testify that they were compatible with it:

> The conclusion that I . . . have reached is that the bullets are of the same classification as to the caliber, class characteristics, and measurements to have been fired from . . . a Rossi revolver, such as the one submitted.

Gross's close friend Troy King testified that at sometime after New Year's Day, he and Gross and King's cousin, Charles Carpenter, all went out drinking in Georgetown. Both Troy King and Charles Carpenter testified that as the three of them were leaving the Georgetown area that evening, Gross reached either into the glove compartment of his car or into a door panel and produced the .32 caliber Rossi revolver. He handed it to King and asked King to keep it for him.

In addition to having to offer some explanation for the hairs and fibers linking Peggy Courson to his automobile, a necessity to place some spin on his possession of the .32 Rossi revolver was also part of the obvious motivation for Gross to take the stand in his own defense. Gross testified that during the month of December he had received the gun from Sidney Scott as an unsolicited gift. He offered no explanation, however, as to why Scott gave him the gun. He further testified that he had no use for the gun and, therefore, subsequently gave it to Troy King as a gift because Troy King was interested in guns and collected guns.

As proof of guilt, the ballistics evidence, in and of itself, would not have been legally sufficient to send the case to the jury because of the inability of the examiner to make a "match." The totality of evidence surrounding the gun, on the other hand, had far more significance than did the ballistics examination standing alone. Both King and Carpenter testified that as Gross gave the revolver to King he said, "Be careful with it because it already had one life on it."

The totality of evidence surrounding the gun, therefore, was 1) that the revolver was of the type that could have fired the bullets taken from Peggy Courson's body; 2) that at about the time the investigation was beginning to focus on Gross, Gross felt some obvious desire to get rid of the weapon; and 3) that Gross acknowledged to King and Carpenter that someone had been killed with that gun.

## G. The Presently Unexceptionable Evidence of Guilt

Collectively, all of the evidence thus far discussed constituted overwhelming proof of Gross's guilt. None of the contentions raised by Gross in his petition for post-conviction relief on the basis of the ineffective assistance of counsel involves in any way the evidence of guilt thus far discussed. Every contention and subcontention alleging ineffective assistance of counsel, at both the trial and appellate levels, concerns only the fifth and more peripheral category of evidence yet to be discussed. That category is the DNA PCR evidence showing

that Gross could not be **excluded** from the class of persons who might have been the donor of a DNA specimen found on the body of Peggy Courson.

### H. The DNA PCR Evidence

A blood sample was taken from Gross in order to examine it and to establish his known DNA pattern. A vaginal swab was taken from the body of Peggy Courson and it was examined for possible DNA traces. Melissa Weber, a Senior Molecular Biologist for the Cellmark Diagnostic Laboratory, examined the two specimens to see if Gross had possibly left his DNA "fingerprint" on the body of Peggy Courson.

Almost all of the Maryland appellate decisions dealing with DNA evidence involve DNA testing done by the Cellmark Diagnostic Laboratory. Invariably, the expert witnesses appearing in the opinions are Melissa Weber and Charlotte Word, both senior-level scientists working for Cellmark.

To understand the significance (or more pertinently, perhaps, the relative insignificance) of what the examination revealed in this case, it is necessary to appreciate the difference between DNA RFLP analysis and DNA PCR analysis. "RFLP" stands for the Restriction Fragment Length Polymorphism type of DNA analysis. *Armstead v. State,* 342 Md. 38, 53, 673 A.2d 221, referred to it in 1996 as the "most widely used technique at present." It, as opposed to the PCR technique, requires a bigger sample quantitatively and a better sample qualitatively in order to produce an acceptable result. It is capable, however, of yielding a unique "match," pinpointing a particular suspect as the donor of the DNA left at the crime scene or on the body of the victim.

As admissible evidence it received the *imprimatur* of the Maryland Legislature in 1991 (Ch. 631 of the Acts of 1991), now codified as Cts. & Jud. Proc., § 10–915(a)(3). Most of the Maryland cases involving DNA are cases where the RFLP analysis was used. *Yorke v. State,* 315 Md. 578, 556 A.2d 230 (1989); *Cobey v. State,* 80 Md.App. 31, 559 A.2d 391 (1989); *Jackson v. State,* 92 Md.App. 304, 324–25, 608 A.2d 782 (1992);

*Keirsey v. State,* 106 Md.App. 551, 665 A.2d 700 (1995); *Armstead v. State,* 342 Md. 38, 673 A.2d 221 (1996).

The newer and thus far less probative type of DNA analysis is identified as "PCR analysis" and takes its name from a technique known as Polymerase Chain Reaction. In a footnote, *Armstead v. State,* 342 Md. at 53, n. 9, 673 A.2d 221, referred to it as "a newer method" that "is particularly helpful in analyzing DNA where there is a very small evidence sample to be tested." It is a type of test that may be employed with a small DNA sample to work with and where the quality of the DNA sample is not as good. In its present development, however, it will not yield a "match," pinning down with virtual certainty the identity of the DNA donor. In its present state of development, it can do no more than "exclude" or "not exclude" a particular person from a large class of persons who might have been the donor of the DNA in question.[2] Only two reported opinions involved cases where DNA PCR analysis was actually used. *Williams v. State,* 342 Md. 724, 744–52, 679 A.2d 1106 (1996); *Chase v. State,* 120 Md.App. 141, 153, 706 A.2d 613 (1998).

In *Williams v. State,* 342 Md. at 744, 679 A.2d 1106, Judge Chasanow explained the important differences between the two forms of DNA analysis:

[T]he DNA evidence was obtained using a DNA testing procedure called "polymerase chain reaction" (PCR). PCR testing differs from a more established form of DNA testing, known as "restriction fragment length polymorphism" (RFLP).... *RFLP testing can provide "a very specific match between two samples," PCR testing can only "narrow down a potential number of donors to a certain group."* ... *[W]hile RFLP testing requires a large sample of material, PCR testing can be done on much smaller samples*

---

**2.** As an illustration of what frequently turns out to be the evidentiary insignificance of a "non-match" or an "exclusion," *see Yorke v. State,* 315 Md. 578, 588–90, 556 A.2d 230 (1989).

because it isolates and then replicates the DNA before typing it.

(Footnote omitted; emphasis supplied).

Melissa Weber, of Cellmark Diagnostic, was accepted as an expert witness on DNA analysis. She described the difference between the two testing techniques:

> There are two different kinds of testing we can do to look at a person's DNA; one is called RFLP testing and one is called PCR testing. *RFLP testing is a type of test* many of you may have heard of *where the results are very, very conclusive. If you have a match between two samples, there's a very high probability often that that person is the source of that DNA. For PCR testing, the DNA that we're looking at is not as exclusive.* Some people can share certain forms of DNA that we look at for the PCR testing. So, *the most conclusive we can get with PCR testing is either that someone is excluded or cannot be excluded. It's much less of an identification tool than the RFLP testing is.* So, the RFLP testing is much more specific as far as an identification than the PCR testing is.

(Emphasis supplied).

When asked to explain why a laboratory would sometimes use "RFLP testing that is very conclusive" and at other times use "PCR testing that is less conclusive," she explained:

> Because the RFLP testing is more conclusive, usually that's the more desired type of test that people like us to do. However, *for RFLP testing you need a lot of DNA.* You need a good quantity of DNA to perform the tests. *And you also need DNA that's in very good shape;* that hasn't been broken down in any way due to time or the environment. So, *while RFLP is a much more specific kind of test, it needs a great amount both in quantity and quality of DNA to perform.*
>
> *The PCR test is a less specific kind of test but it will work with very, very small amounts of DNA. So, if your sample size is very small or limited, PCR testing is what you'll need to use.*

The contrast can be explained by [the fact that] *for RFLP testing, you would need a blood stain about the size of a nickel or a quarter and for PCR testing you can use a blood stain about the size of the head of a pin.* That's the kind of difference in the amount of DNA that's required for each test.

(Emphasis supplied).

Dr. Charlotte Word, the other expert witness from Cellmark Diagnostic, confirmed that whereas DNA RFLP analysis will produce a "match," identifying a suspect with certainty, DNA PCR analysis does not even presume to suggest a "match":

[W]hen you do RFLP testing, you can actually state that you have a match with regard to DNA; that we have a specific match of a known and unknown sample.

A: Are you using match in the sense of a unique identification?

Q: Yes. Yes.

A: Yes, if we can test enough sites of the DNA with RFLP testing, we have the ability to uniquely identify an individual to the exclusion of all other people in the world, basically.

Q: All right. *But with PCR testing, you're not able to do that. Is that correct?*

A: *Not with the level of testing that we have right now, no.*

(Emphasis supplied).

Melissa Weber went on to testify that although initially a DNA RFLP analysis was attempted, "we didn't get any results" because "there was not enough DNA present to obtain results with the RFLP method." The DNA PCR analysis was then used and as a result of it, all that could be testified to was that Gross could not be excluded from the class of persons who could possibly have been a donor of the DNA in question. There was no suggestion that Gross was "identified" as someone who had been in physical contact with Peggy Courson. If the establishment of his criminal agency had depended on the DNA PCR analysis, the State clearly

would not have met its burden of production required to take the case to the jury.

All of the claims of ineffective assistance of counsel, both trial and appellate, made by Gross and ruled on in his favor on his Petition for Post–Conviction Relief, revolve about the admission into evidence of this DNA PCR analysis with its conclusion that he was "not excluded" from those who could have been the donor of the DNA sample found in the vaginal swab of Peggy Courson. It will be remembered, of course, that Gross took the stand and testified to having had sexual intercourse with Peggy Courson within a period of no more than twenty-four to twenty-six hours preceding her death.

## STANDARD OF REVIEW FOR EFFECTIVENESS OF COUNSEL

At the hearing on the Petition for Post–Conviction Relief, the circuit court ruled that Gross had been denied the effective assistance of counsel both at the trial level and at the appellate level. It provided alternative relief. Our review of the findings of ineffectiveness at those respective levels requires separate analyses.

### 1. Effectiveness of Trial Counsel

The fountainhead is *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). After pointing out that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," 466 U.S. at 686, 104 S.Ct. 2052, the Supreme Court went on to establish the now classic two-pronged test for making such a determination. It referred to the two distinct elements that had to be analyzed as the "performance component" and the "prejudice component" of the "ineffectiveness inquiry." 466 U.S. at 698, 104 S.Ct. 2052.

A number of Maryland cases, incidentally, have discussed and applied *Strickland* and its two-pronged test. *Wiggins v.*

*State,* 352 Md. 580, 600–03, 724 A.2d 1 (1999); *Oken v. State,* 343 Md. 256, 283–95, 681 A.2d 30 (1996); *Gilliam v. State,* 331 Md. 651, 664–86, 629 A.2d 685 (1993); *State v. Thomas,* 328 Md. 541, 616 A.2d 365 (1992); *Williams v. State,* 326 Md. 367, 605 A.2d 103 (1992); *State v. Thomas,* 325 Md. 160, 169–73, 178–88, 599 A.2d 1171 (1992); *Bowers v. State,* 320 Md. 416, 578 A.2d 734 (1990); *State v. Colvin,* 314 Md. 1, 5–7, 14–19, 548 A.2d 506 (1988); *State v. Calhoun,* 306 Md. 692, 728–38, 511 A.2d 461 (1986); *State v. Tichnell,* 306 Md. 428, 433–57, 509 A.2d 1179 (1986); *Harris v. State,* 303 Md. 685, 496 A.2d 1074 (1985); *State v. Purvey,* 129 Md.App. 1, 5–27, 740 A.2d 54 (1999), *cert. denied* 357 Md. 483, 745 A.2d 437 (2000), and *Cirincione v. State,* 119 Md.App. 471, 483–509, 705 A.2d 96, *cert. denied* 350 Md. 275, 711 A.2d 868 (1998).

## A. The Performance Component

With respect to the performance component—the assessment of whether trial counsel's representation was so deficient as to undermine the adversarial process—*Strickland* pointed out:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made *errors so serious that counsel was not functioning as the "counsel" guaranteed* the defendant *by the Sixth Amendment.*

466 U.S. at 687, 104 S.Ct. 2052 (emphasis supplied). *Strickland* then admonished that counsel is not to be measured against an ideal standard but is to be assessed in terms of whether his lawyerly assistance was "reasonable" and that that is to be measured "under prevailing professional norms":

> As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of *reasonably effective assistance.* ... When a convicted defendant complains of the ineffectiveness of counsel's assistance, *the defendant must show that counsel's representation fell below an objective standard of reasonableness.*
>
> . . .

> *The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.*

466 U.S. at 687–88, 104 S.Ct. 2052 (citations omitted; emphasis supplied).

It was in this regard that *Gilliam v. State*, 331 Md. 651, 665–66, 629 A.2d 685 (1993), carefully pointed out:

> *Strickland v. Washington* requires that defense counsel's representation meet "an objective standard of reasonableness." "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *The Sixth Amendment does not require the best possible defense or that every attorney render a perfect defense.* In order to be deficient, *counsel's acts or omissions must be "outside the wide range of professionally competent assistance."* " '[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " *The courts should not, aided by hindsight, second guess counsel's decisions.*

(Citations omitted; emphasis supplied).

In guarding against too facile a finding of deficient performance by trial counsel, the Supreme Court circumscribed after-the-fact review, by post-conviction court and appellate court alike, with a number of cautionary admonitions. One of those is that "judicial scrutiny of counsel's performance must be highly deferential" and that reviewing courts should be especially careful not to judge a performance through the distorting lens of hindsight.

> It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hind-*

*sight*, to reconstruct the circumstances of counsel's challenged conduct, *and to evaluate the conduct from counsel's perspective at the time.* Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689, 104 S.Ct. 2052 (citations omitted; emphasis supplied).

The Maryland Court of Appeals has similarly warned reviewing courts to be wary of the distorting effect of hindsight. In *State v. Calhoun,* 306 Md. 692, 735, 511 A.2d 461 (1986), Judge Smith pointed out that counsel is under no duty to anticipate a change in the case law:

[A]s *Strickland* makes plain, counsel must be judged upon *the situation as it existed at the time of trial.* We had not at that time decided *Scott,* 297 Md. 235, 465 A.2d 1126. *There was no duty on counsel to foresee that we might hold as we held in that case.*

(Emphasis supplied).

*Cirincione v. State,* 119 Md.App. 471, 492, 705 A.2d 96 cert. denied, 350 Md. 275, 711 A.2d 868 (1998), similarly cautioned against judgment by hindsight:

To claim that presenting this additional testimony would have been more persuasive is *an appeal to the same "distorting effects of hindsight" which we are called upon to eliminate in our assessment of trial counsel's performance. Strickland,* 466 U.S. at 689[, 104 S.Ct. 2052]. We cannot know whether a different trial strategy would have led to a different result, but *the fact that the selected strategy was ultimately unsuccessful does not mean that it was an unreasonable choice.*

(Emphasis supplied).

*Strickland v. Washington* also made it clear that there is a strong presumption that counsel's decisions were made in the

exercise of reasonable professional judgment and that the burden is on the defendant to overcome that presumption:

> *[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.* A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.... [T]he court should recognize that *counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.*

(Emphasis supplied).

In *Oken v. State,* 343 Md. 256, 283, 681 A.2d 30 (1996), Judge Raker confirmed that Maryland recognizes and applies that strong presumption as to the effectiveness of counsel's performance:

> To establish that a deficiency existed, Oken must demonstrate that his counsel's acts or omissions were the result of unreasonable professional judgment and that counsel's performance, given all the circumstances, fell below an objective standard of reasonableness considering prevailing professional norms. *Oken must* also *overcome the presumption that the challenged action might,* under the circumstances, *be considered sound trial strategy.*

(Citations omitted; emphasis supplied).

### B. The Prejudice Component

*Strickland v. Washington* then carefully pointed out that even if an "error by counsel" is demonstrated, such an error, "even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691, 104 S.Ct. 2052.

There is an affirmative burden on a defendant to prove prejudice:

[I]neffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. . . .

466 U.S. at 693, 104 S.Ct. 2052.

*Strickland* requires that a defendant do more than show that an error by counsel "could have influenced the outcome" of the case:

Even if a defendant shows that particular errors of counsel were unreasonable, . . . the defendant must show that they *actually had an adverse effect on the defense.*

It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test and *not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.*

466 U.S. at 693, 104 S.Ct. 2052 (citations omitted; emphasis supplied).

The heavy burden on the defendant is to show a reasonable probability that the outcome of the trial would have been different:

The defendant must show that there is *a reasonable probability that,* but for counsel's unprofessional errors, *the result of the proceeding would have been different.* A reasonable probability is a probability sufficient to undermine confidence in the outcome.

466 U.S. at 694, 104 S.Ct. 2052 (emphasis supplied).

What *Strickland* termed "a reasonable probability" that the trial result would have been different, *Oken v. State,* 343 Md. at 284, 681 A.2d 30, re-cast as "a substantial possibility" that the result would have been different:

In order to establish prejudice, Oken must show that there is *a substantial possibility that,* but for counsel's unprofes-

sional errors, *the result of the proceeding would have been different.*

(Emphasis supplied).

*Kimmelman v. Morrison,* 477 U.S. 365, 387–89, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) is an excellent elucidation of the prejudice component.[3]

## 2. Effectiveness of Appellate Counsel

■ The two-pronged test enunciated in *Strickland* applies to claims of ineffective assistance of appellate counsel just as surely as it does to claims of ineffective assistance of trial counsel. *Smith v. Robbins,* 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) ("[T]he proper standard for evaluating Robbins's claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington* [.]").

Although the basic principles enunciated by *Strickland* remain the same, whether applied to a trial performance or an appellate performance, the juridical events to which those principles apply obviously differ somewhat depending on the operational level being scrutinized. In *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the Supreme Court assessed the constitutional adequacy of appellate lawyering. The United States Court of Appeals for the 2nd Circuit had granted *habeas corpus* relief because an attorney had failed to raise on appeal a non-frivolous argument specifically requested by a defendant. In reversing the 2nd Circuit, the Supreme Court pointed out that the strategic selection of which appellate issues to raise and which to ignore is one entrusted to the strategic judgment of appellate counsel:

There can hardly be any question about the importance of having the appellate advocate examine the record with a view to *selecting the most promising issues for review.* This has assumed a greater importance in an era when oral

---

3. An elaboration on *Strickland*'s language about "a reasonable probability that . . . the result of the proceeding would have been different," not at all pertinent to this case, may be found in *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) and *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1512–16, 146 L.Ed.2d 389 (2000).

argument is strictly limited in most courts—often to as little as 15 minutes—and when page limits on briefs are widely imposed. Even in a court that imposes no time or page limits, however, the new per se rule laid down by the Court of Appeals is contrary to all experience and logic. *A brief that raises every colorable issue runs the risk of burying good arguments*—those that, in the words of the great advocate John W. Davis, "go for the jugular." Davis, *The Argument of an Appeal*, 26 ABAJ 895, 897 (1940)—*in a verbal mound made up of strong and weak contentions.*

463 U.S. at 752–53, 103 S.Ct. 3308 (citation omitted; emphasis supplied).

In *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), the defendant's argument was that his lawyer had failed to raise a colorable issue and had, thereby, denied him effective assistance of appellate counsel. In rejecting that argument, the Supreme Court reaffirmed the role of appellate counsel in assessing the relative strengths and weaknesses of various arguments and in choosing, as a matter of tactics, which to push and which to ignore:

After conducting a vigorous defense at both the guilt and sentencing phases of the trial, counsel surveyed the extensive transcript, researched a number of claims, and decided that, under the current state of the law, 13 were worth pursuing on direct appeal. *This process of "winnowing out weaker arguments on appeal and focusing on" those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.*

477 U.S. at 535–36, 106 S.Ct. 2661 (emphasis supplied).

■ There is also a difference in the end product to be assessed when it comes to the prejudice prong of *Strickland*'s two-pronged test. Even an inexplicable and apparently indefensible failure to raise an appellate issue does not automatically give rise to a presumption of prejudice. *Smith v. Robbins* makes it clear that the burden remains with the petitioner to demonstrate prejudice at the appellate level by showing that had the unraised argument been raised, the appeal would probably have been successful:

If Robbins succeeds in such a showing [of a deficient performance], *he* then *has the burden of demonstrating prejudice.* That is, *he must show a reasonable probability that,* but for his counsel's unreasonable failure to file a merits brief, *he would have prevailed on his appeal.*

528 U.S. at ——, 120 S.Ct. at 764, 145 L.Ed.2d at 780 (emphasis supplied).

Even under circumstances where 1) counsel had failed to consult with a convicted defendant about the possibility of an appeal and 2) counsel, without the express consent of the defendant, had failed to file any appeal at all, the Supreme Court, in *Roe v. Flores–Ortega,* 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000), held that appellate counsel's performance was not *per se* deficient. The Court still insisted on an actual showing, under *Strickland,* with respect to both components of its two-pronged test.

We cannot say, as a *constitutional* matter, that in every case counsel's failure to consult with the defendant about an appeal is necessarily unreasonable, and therefore deficient. Such a holding would be inconsistent with both our decision in *Strickland* and common sense.

528 U.S. at ——, 120 S.Ct. at 1036, 145 L.Ed.2d at 996 (emphasis in original). Justice O'Connor elaborated further on the ultimate or underlying purpose of the Sixth Amendment's guarantee:

[W]e have consistently declined to impose mechanical rules on counsel—even when those rules might lead to better representation—not simply out of deference to counsel's strategic choices, but because "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... [but rather] simply to ensure that criminal defendants receive a fair trial."

528 U.S. at ——, 120 S.Ct. at 1037, 145 L.Ed.2d at 997.

### 3. The Standard of Appellate Review

█ In reviewing a hearing judge's determination on a claim of ineffective assistance of counsel, we will, of course,

extend great deference to the hearing judge's findings of disputed, first-level, historic facts, but will nonetheless make our own independent decision with respect to the ultimate legal significance of those facts. *Strickland v. Washington,* 466 U.S. at 698, 104 S.Ct. 2052, was emphatic in this regard:

> *Ineffectiveness is not a question of "basic, primary, or historical fac[t]."* Rather, . . . it is a mixed question of law and fact. . . . *[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.*

(Citations omitted; emphasis supplied).

Within a year of *Strickland*'s having been decided, Judge Orth set out clearly the function of appellate review in *Harris v. State,* 303 Md. 685, 698, 496 A.2d 1074 (1985):

> *[I]n making our independent appraisal,* we accept the findings of the trial judge as to what are the underlying facts unless he is clearly in error. *We then re-weigh the facts as accepted in order to determine the ultimate mixed question of law and fact,* namely, was there a violation of a constitutional right as claimed. *Walker v. State,* 12 Md. App. 684, 691–95, 280 A.2d 260 (1971)[.]

(Emphasis supplied).

*Cirincione v. State,* 119 Md.App. at 485, 705 A.2d 96, relied on *Strickland* in pointing out the distinction between first-level facts and ultimate, conclusory, or constitutional facts. Judge Thieme explained that although "we will defer to the post-conviction court's findings of historic fact, absent clear error," when it comes to the dispositive and conclusory fact "we make our own, independent analysis of the appellant's claim." *See also State v. Thomas,* 328 Md. 541, 559, 616 A.2d 365 (1992).

*State v. Purvey,* 129 Md.App. 1, 10, 740 A.2d 54 (1999), was equally clear as to the standard of appellate review:

> Within the *Strickland* framework, *we will evaluate anew the findings of the lower court as to the reasonableness of counsel's conduct and the prejudice suffered.* Whether counsel's performance has been ineffective is a mixed ques-

tion of fact and law. *Strickland,* 466 U.S. at 698[, 104 S.Ct. 2052].... As a question of whether a constitutional right has been violated, *we make our own independent evaluation* by reviewing the law and applying it to the facts of the case.

(Emphasis supplied).

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

For reasons that will become clear as our analysis unfolds, it will be logically convenient for us to address initially the issue of the effectiveness of the assistance of Gross's appellate counsel. Although the appropriate relief for ineffective assistance of trial counsel would be the granting of a new trial, the appropriate relief for ineffective assistance of appellate counsel would be the awarding of a belated or new appeal, at which issues which should have earlier been raised may ultimately be considered. In *Williams v. State,* 326 Md. 367, 382, 605 A.2d 103 (1992), Judge Bell (now Chief Judge) pointed out for the Court of Appeals that the relief "should be tailored to fit" the deficiency:

This raises the question of the appropriate remedy for that incompetence. In *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 668, 66 L.Ed.2d 564, 568 (1981), the Supreme Court pointed out that *relief from a violation of the Sixth Amendment right to the effective assistance of counsel should be tailored to fit the circumstances of the case. A new trial is not the appropriate remedy since the violation did not impact the fairness of the trial.*

(Emphasis supplied).

Following the post-conviction hearing, the Amended Order, after granting a new trial because of the finding that trial counsel had been ineffective, also granted conditional alternative relief because of the finding that appellate counsel had been ineffective:

**ORDERED** that Petitioner's Petition for Post Conviction Relief on the grounds of ineffective assistance of appellate

counsel is GRANTED and Petitioner will have 30 days to file a Notice of Appeal to the Court of Special Appeals of Maryland, in the event that:

> (1) the granting of a new trial is set aside; and

> (2) the Court of Special Appeals of Maryland agrees with that portion of the Memorandum Opinion and Order granting Petitioner a new appeal[.]

In the 37–page Memorandum Opinion and Order of the Circuit Court, seven pages were devoted to the hearing judge's conclusions with respect to the ineffectiveness of appellate counsel. In addressing *seriatim* the six alleged instances of ineffective assistance raised in the Petition for Post–Conviction Relief and two Supplements, the hearing judge rejected Gross's claim with respect to three of those instances. In three other regards, however, the Circuit Court ruled that Gross had been denied the effective assistance of appellate counsel. The Circuit Court found specifically that appellate counsel had been ineffective 1) for failing to appeal the trial court's ruling on the motion to suppress the DNA PCR evidence, 2) for failing to appeal the trial court's refusal to accept Dr. Walter Rowe as an expert in DNA PCR evidence, and 3) for failing to appeal the trial court's acceptance of the DNA PCR evidence in the absence of accompanying population genetics statistics.

### 1. The Performance Component of Appellate Representation

■ We turn our attention first to what *Strickland v. Washington* referred to as "the performance component of an ineffectiveness claim." 466 U.S. at 697, 104 S.Ct. 2052. Upon our independent review of this mixed question of law and fact, we conclude that the performance of Gross's appellate counsel was not only effective but highly commendable.

■ Following Gross's trial and convictions, appellate counsel's first responsibility was to select the most promising issues to pursue on the appeal to this Court. "The decision whether to raise an issue on appeal is quintessentially a

tactical decision of counsel." *Oken v. State,* 343 Md. 256, 271, 681 A.2d 30 (1996). Gross's argument that he was denied the effective assistance of counsel is based exclusively on the fact that counsel failed to raise certain issues on appeal. Whether computed as two or three such issues, the issues all concern the ultimate admissibility of DNA evidence linking the appellant to the victim.

With respect to the selection of which issues to raise on appeal, the observation of the United States Court of Appeals for the 7th Circuit in *Gray v. Greer,* 800 F.2d 644, 647 (1986), is very pertinent:

> [T]he right to effective assistance of appellate counsel does not require an attorney to advance every conceivable argument on appeal which the trial record supports. We require only that appellate counsel's choice of issues for appeal did not fall below "an objective standard of reasonableness."

(Citations omitted). In assessing appellate counsel's decision in that regard, the 7th Circuit made it clear that a reviewing court should look not only at the issues that were not raised but also at the issues that were and should then compare the two:

> Significant issues which could have been raised should then be compared to those which were raised. Generally, *only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.*

*Id.* at 646 (emphasis supplied).

We are not suggesting for a moment that Gross's claims with respect to the DNA evidence were frivolous. An effective performance by appellate counsel, however, does not require that every claim, even if non-frivolous, be raised on appeal. *Smith v. Robbins,* 528 U.S. 259, ——, 120 S.Ct. 746, 765, 145 L.Ed.2d 756, 782 (2000), observed in this regard:

> *[A]ppellate counsel* who files a merits brief *need not* (and should not) *raise every nonfrivolous claim, but* rather *may*

*select from among them in order to maximize the likelihood of success on appeal.*

(Emphasis supplied).

Gross's appellate counsel testified that he and his co-counsel engaged in just such a selection process based on just such a criterion:

> [W]e raised those issues we thought we had the best chance of success with and those are the issues that are contained in the brief.

Gross argues that the raising of certain legitimate arguments on his appeal to this Court in no way precluded the raising of the DNA-related arguments as well. He ignores, however, the strategic value of limiting an appeal to several strong arguments rather than diffusing the appellate force over too broad a range of issues. With respect to such strategic considerations, as to which appellate courts are loathe to second-guess appellate counsel, *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), cogently observed:

> Experienced advocates since time beyond memory have emphasized *the importance of* winnowing out weaker arguments on appeal and *focusing on one central issue if possible, or at most on a few key issues.*

(Emphasis supplied).

In *Jones v. Barnes,* the Supreme Court also quoted with approval, 463 U.S. at 752, 103 S.Ct. 3308, from Justice Robert Jackson's article "Advocacy Before the United States Supreme Court," 25 Temple L.Q. 115, 119 (1951):

> One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. *Legal contentions, like the currency, depreciate through over-issue.* The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one.... *[E]xperience on the bench convinces*

*me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.*

(Emphasis supplied).

The Supreme Court similarly quoted with approval from R. Stern, *Appellate Practice in the United States* 266 (1981):

Most cases present only one, two, or three significant questions.... Usually, ... if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention. The effect of adding weak arguments will be to dilute the force of the stronger ones.

*Id.*

*Jones v. Barnes* also quoted with approval from the 1980 manual of the Association of the Bar of the City of New York on practice before the Court of Appeals for the 2 nd Circuit:

[A] brief which treats more than three or four matters runs serious risks of becoming too diffuse and giving the overall impression that no one claimed error can be serious.

*Id.* at 752 n. 5, 103 S.Ct. 3308.

Gross's appellate counsel testified that he did the very things *Jones v. Barnes* encourages a good appellate attorney to do in concentrating the attack and stressing the strong points:

I believe we made prudent decisions that were intellectually thought out and they were well-reasoned at the time. I don't think there's anybody who does this for a living that after hindsight and going back and reviewing every piece of evidence and listening to other people's views on things might have done things differently. But I think with the information that we had I think that we made the best decisions as the time, at least we felt we were making on behalf of Mr. Gross.

## The Appeal: An Overview

On the direct appeal of Gross's convictions to this Court, counsel raised nine significant issues, in response to which this Court issued a 43–page opinion. On one of those issues, Gross prevailed completely and won the reversal of his conviction for kidnapping, for which he had received a sentence of 25 years. On a second issue, Gross achieved a partial victory. His conviction for first-degree rape, for which he had received a sentence of 25 years, was vacated and ordered merged into his conviction for first-degree murder.

At oral argument before this Court, counsel for Gross disdained the significance of those victories because the two 25–year sentences were concurrent both with each other and with the life sentence for first-degree murder. Strong strategic considerations, however, dictated attacking those predicate felonies for first-degree felony murder, as we shall discuss more fully *infra.*

## Appellate Issue # 1:
## Search and Seizure

In evaluating appellate counsel's performance, it is difficult to find fault with his strategic approach. Of the nine contentions he did raise, first and foremost was an attack on the search warrants. The Anne Arundel County Police Department had obtained search warrants for 1) Gross's person, 2) Gross's car, and 3) Gross's residence, all of which were executed on January 10, 1994. Samples of Gross's blood, hair, and saliva were obtained and submitted to the crime laboratory. Without those samples, there would have been no DNA identification. In the search of the appellant's vehicle, the police discovered a notebook containing both the murder victim's handwriting and her fingerprints. They also collected fibers from the vehicle's carpet which matched fibers found on the victim's clothes and body. This evidence indicating that the victim had been in Gross's vehicle self-evidently was a significant factor in convincing Gross that he had no choice but to take the stand in an attempt to explain away his obvious contact with the victim.

Gross's appellate counsel attacked all of this evidence by arguing that he was entitled to a "taint" hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). He detailed a number of "discrepancies and omissions between the statement of probable cause attached to the warrant applications and the police report" and argued that they showed that the affiants on the warrants had either intentionally lied or showed a reckless disregard for the truth. There were a number of omissions of arguably exculpatory significance that captured the attention of this Court. Although we ultimately rejected the contention, we grappled with it in our opinion in an extended discussion. This was clearly a plausible contention that should have been raised and was raised.

### Appellate Issues 2, 3, 4, and 5:
### Legal Sufficiency of the Evidence

In Gross's next four contentions, respectively, his counsel attacked the legal sufficiency of the State's evidence to support the convictions for 1) first-degree rape, 2) kidnapping, 3) first-degree murder of the premeditated variety, and 4) first-degree felony murder and the use of a handgun in the commission of a felony.

The conviction for first-degree rape was not only significant in its own right; it was also one of the two possible predicate felonies the State was relying on to prove first-degree felony murder. Counsel mounted a strong attack on the rape conviction on two separate grounds. He challenged the State's proof of the fact of vaginal intercourse. That attack was based on the very equivocal nature of the evidence as to the presence of spermatozoa in the victim's vagina. The State Medical Examiner testified that the autopsy examination "did not indicate the presence of sperm or lubricant for sexual intercourse." The medical examiner "found no evidence that [the victim] had engaged in sexual relations prior to the time of her death." A police department serologist, on the other hand, took a vaginal swab from the victim's genital area at the crime scene, which revealed the presence of "a very few sperm

cells." Counsel quite properly challenged the proof of the fact of vaginal intercourse.

Counsel also challenged the State's proof that the sexual intercourse, if proved to have occurred, was other than consensual. Gross testified that he had consensual sexual relations with the victim one day before her murder. The medical examiner, moreover, did not find any bruises or scrapes in the victim's vaginal area. In approximately four pages, we rejected that challenge to the sufficiency of the evidence. It was, however, a challenge worthy of being raised, particularly so in that it ultimately turned out to be the only predicate left standing to support the conviction for first-degree felony murder.

The strategic wisdom of challenging the kidnapping conviction speaks for itself. We found that the evidence was not legally sufficient to support the charge and we reversed that conviction. Not only did the reversal eliminate a conviction for a major felony in its own right; it removed from the case one of the two possible predicates relied on by the State to prove first-degree felony murder.

In this case, the jury returned a verdict of guilty of first-degree murder generally. It was not asked to specify and it did not specify whether that verdict was based on a premeditated killing rationale or a felony-murder rationale or both. Of necessity, Gross had to attack his most significant conviction by challenging the legal sufficiency of the evidence to support either rationale. His attack on the premeditated killing rationale was based on the lack of evidence to show that Gross deliberately and with premeditation killed the victim. Evidence indicated that Gross only "felt like he had to" kill his victim after his companion, Scott, unexpectedly shot her. Gross's claim, certainly a plausible one, was that his decision to kill was sudden and spontaneous and did not, therefore, qualify as a premeditated murder. Although we rejected the claim, it was not a frivolous claim and it was one that had to be made.

The appellant's attack on his conviction for first-degree murder on a possible felony-murder rationale and his related attack on his conviction for the use of a handgun in the commission of a felony constituted a necessary complementary claim to his earlier attacks on his rape and kidnapping convictions. If he had been successful in both of those earlier contentions, as he was on one of them, that would have eliminated any basis for either felony murder or the use of a handgun in the commission of a felony. That salutary result, however, would not have followed automatically from his earlier successes. It would still have been necessary for him to frame, as he did, a separate and distinct contention with respect to the two crimes that arose out of and depended on a conviction for a predicate felony.

### Appellate Issue # 6:
### Mandatory Merger Under *State v. Frye*

It also would have been foolhardy for Gross's counsel not to have raised the contention with respect to the merger of the rape conviction into the murder conviction. Once Gross succeeded in having his kidnapping conviction reversed, the rape conviction remained as the only possible predicate for felony murder. Because the jury was silent as to its rationale for the first-degree murder conviction, Gross was entitled, under *State v. Frye*, 283 Md. 709, 393 A.2d 1372 (1978), to the benefit of the presumption that the verdict was based on a felony-murder rationale. That being the case, the sentence for rape was vacated and the rape conviction was merged into the murder conviction. The wisdom of making this contention on appeal speaks for itself.

### Appellate Issues 7 and 8:
### The Composition of the Jury

Gross's final three contentions on appeal related to the composition of the jury. By way of context, the pool of fifty prospective jurors included only four African–Americans. Gross himself is an African–American. On the basis of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),

Gross challenged the striking of juror number 38, an African-American female, with its obvious impact of eliminating 25 per cent of the potential pool of African-American jurors. We rejected the claim because of the trial judge's finding that the State's exercise of its strike was based on the prospective juror's knowledge of DNA testing. Because the State was called upon to explain its strike, however, it cannot be said that the contention was insignificant.

The jury that was ultimately impaneled consisted of two African-Americans and ten Caucasians. After opening statements, the court recessed the proceedings for the day and directed the jurors to return the following morning. When court began the next morning, the judge informed counsel for both parties that juror number 10, one of two African-Americans, was excused and would be replaced by an alternate, who happened to be Caucasian. The court at that time gave no explanation for the substitution.

At the subsequent motion for a new trial, it was established that juror number 10 had contacted the judge through the bailiff at the conclusion of the first day. She was brought into the judge's chambers where she expressed certain fears. She also indicated that she was uncomfortable because she knew that her minister was supporting Gross. Although we ultimately rejected the claim, primarily because of non-preservation, the claim clearly was worthy of being raised and argued.

### Appellate Issue # 9:
### The Right to Be Present at Every Stage of Trial

The final contention raised by appellate counsel related to the removal of that juror. That final argument was based upon the alleged violation of Gross's right to be present at all stages of his trial. He claimed that the *ex parte* conference between the excused juror and the judge violated that right. Our rejection of the claim was based simply on waiver through lack of objection. Under the circumstances, it cannot be said that the claim was not worthy of being advanced by appellate counsel.

## Comparing Relative Strengths
## And Relative Weaknesses

Gross's appellate counsel obviously mounted a formidable appellate challenge to his convictions, raising a number of difficult and perplexing issues. The hearing judge found that counsel was ineffective for failing to raise three other issues. All three related to the DNA evidence. Actually, the three issues reduce themselves to two, in that two of them are simply variations on the same evidentiary ruling. One of them refers to the trial judge's denial of Gross's motion *in limine* to exclude the DNA results generally; another refers to the same denial of the same motion on the ground that the results were inadmissible absent accompanying population genetics statistics.

It cannot seriously be contended that the issues not raised on Gross's appeal to this Court were "clearly stronger than those presented." It cannot seriously be maintained that appellate counsel failed to select the stronger arguments available to him "in order to maximize the likelihood of success on appeal." It cannot seriously be said that "appellate counsel's choice of issues for appeal ... [fell] below an objective standard of reasonableness."

## The Weakness of the Issues
## Not Raised on Appeal

 In assessing the reasonable adequacy of appellate counsel's strategic judgment in raising certain claims and in rejecting others, we look not simply at the relative strength of the contentions that were made but at the relative weakness of those that were not. With respect to the failure of counsel to appeal the trial judge's denial of Gross's motion *in limine,* an obvious facial weakness of such a contention is that it was never preserved for appellate review. While non-preservation is not *ipso facto* a fatal disqualification (two issues were raised on direct appeal that had not been preserved, although neither ultimately cleared the preservation hurdle), it nonetheless seriously compromises a contention's expectations of success. It is an obvious strategic factor in choosing and then deploying

most effectively one's strongest issues. While that failure to object to the introduction of the evidence at trial might tilt in Gross's favor on the issue of the ineffectiveness of his trial counsel, it tilts decidedly in Gross's disfavor on the issue of the effectiveness of his appellate counsel. It would seem to be the soundest of appellate strategies not to waste precious pages and precious minutes pushing an issue that has not been preserved for appellate review.

Gross's response, not unexpectedly, was that the appellate courts possess the discretion to notice "plain error" notwithstanding the lack of preservation. While that may be true as an abstract principle, the reality is that except under exceedingly rare and extraordinary circumstances, this Court has been and continues to be persistently disinclined to overlook non-preservation. *See, e.g, Austin v. State,* 90 Md.App. 254, 600 A.2d 1142 (1992). We do not hesitate to note that this issue would not have occasioned one of the rare and extraordinary exceptions to that disinclination. Gross's appellate counsel had the prescience to anticipate what our reaction would have been to unpreserved issues.

Quite aside from the problem of non-preservation, the contentions that were not raised were fatally weak on their merits. The hearing judge herself, when looking at the same evidentiary rulings in the context of whether the trial court was guilty of error, found that the rulings were not erroneous. We do not hesitate to note that had these issues been preserved and were they before us on direct appeal, we would not reverse Gross's convictions on the basis of them. Once again, Gross's appellate counsel appreciated the basic weakness of the contentions. It is not a strategic blunder to refrain from pushing losers.

Yet another weakness in the contentions that were not raised is that the DNA evidence to which they relate did nothing but establish that Gross might have been in physical contact with his victim. From the point of view of the pending appeal, that evidence did not prove anything that was in dispute. Gross voluntarily took the stand in his own defense

and testified that he had had sexual intercourse with the victim in his car one day before her body was found. Sound trial strategy dictated that he had to take the stand not to explain why DNA evidence possibly linked him to the victim but primarily to explain away the non-DNA evidence found in his automobile which showed positively that the victim had been present in it and secondarily to explain away his possession of what could have been the murder weapon. He took the stand, as he was essentially compelled to do, and attempted to offer plausible explanations. The DNA evidence, therefore, did not contradict his story but corroborated it.

At the post-conviction hearing, to be sure, Gross argued that at the time the evidentiary ruling was made, he had not yet determined whether to take the stand, notwithstanding his lawyer's testimony to the contrary. That is something that was not in the trial transcript, however, and would not have been before this Court as it considered the impact of his apparently voluntary testimony. It was not a strategic blunder to refrain from raising an issue that, at best, would have been deemed harmless error.

In planning and executing a sound appellate strategy—in determining the optimum number of issues to be advanced and in selecting those issues most likely to achieve success— the performance of Gross's appellate counsel did not fall below that standard of reasonableness demanded by *Strickland v. Washington*.

## 2. Failure of Defendant to Prove Either Component Is Fatal to Claim of Ineffective Assistance

The effectiveness of appellate counsel's performance, of course, is only one of the two basic issues that may be considered in assessing whether a criminal defendant was denied the effective assistance of appellate counsel. *Strickland v. Washington*, 466 U.S. at 698, 104 S.Ct. 2052, referred to "both the performance and prejudice components of the ineffectiveness inquiry." Those distinct components may be considered in any order and the failure of the defendant to

prevail on either could render the vitality of the other aspect of the claim moot.

Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, *there is no reason for a court* deciding an ineffective assistance claim to approach the inquiry in the same order or *even to address both components of the inquiry if the defendant makes an insufficient showing on one.* In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

466 U.S. at 697, 104 S.Ct. 2052 (emphasis supplied).

### 3. The Prejudice Component of Appellate Representation

Whereas Portia's quality of mercy is "twice-blest," Gross's claim that he was denied the effective assistance of appellate counsel is "twice-curst." Quite aside from our conclusion that Gross has failed to establish that he did not receive the benefit of an effective performance by appellate counsel, we also conclude that he has failed to establish, even assuming a deficient lawyerly performance, that he suffered any prejudice thereby. He has proved neither "component of the ineffectiveness inquiry" and to prevail, of course, he must prove both.

The Memorandum Opinion and Order of the hearing judge cited three instances (in effect, two instances) with respect to which she found that Gross had not received the effective assistance of appellate counsel. In the discussion of each of those instances, the hearing judge's conclusions go only to an assessment of the performance component. The assessment reduces itself to a grading of appellate counsel's performance, notwithstanding *Strickland v. Washington*'s admonition that "[t]he object of an ineffectiveness claim is not to grade counsel's performance." 466 U.S. at 697, 104 S.Ct. 2052.

In none of the discussions of the three instances of alleged ineffectiveness is there any suggestion that the prejudice component was even considered. Certainly, there was no detailed or reasoned finding with respect to such prejudice. In the context of resolving an ineffective assistance claim with respect to appellate counsel in *Smith v. Robbins*, 528 U.S. 259, ——, 120 S.Ct. 746, 764, 145 L.Ed.2d 756, 780 (2000), the Supreme Court emphatically stated that even if a defendant "succeeds in such a showing" of deficient lawyerly performance by appellate counsel, he still "has the burden of demonstrating prejudice." In then defining that burden, the Supreme Court made it clear that the defendant "must show a reasonable probability that, but for counsel's unreasonable failure [to raise a claim], he would have prevailed on his appeal."

Ironically, the findings of the hearing judge on a related set of issues actually negated the very possibility of prejudice. The three instances of alleged appellate ineffectiveness arose out of two evidentiary rulings by the trial judge. In each instance, the hearing judge found that appellate counsel was not effective for failing to appeal those rulings. As part of the post-conviction petition, however, Gross also maintained that he was entitled to a new trial because the trial judge had committed reversible error in making those evidentiary rulings. In each instance, the hearing judge found that the trial judge was not in error and that the rulings were correct.

### A. Instance # 1:
### The Denial of the Motion *in Limine* Generally

 The first instance concerns the trial court's denial of Gross's motion *in limine* to exclude any evidence relating to DNA PCR testing. Based on the fact that Gross's counsel believed the evidence was harmful enough to cause him to file the motion *in limine* in the first place, the hearing court concluded that his appellate representation was ineffective because of his subsequent failure to appeal from that adverse ruling:

When O'Neill [defense counsel] lost the pretrial motion *in limine*, he should have objected to the admission of this

evidence during the trial, and then raised this issue on appeal. The *Court finds that there is no reasonable strategy for not appealing this issue.* In failing to raise this issue on appeal, Petitioner's case was prejudiced.

(Emphasis supplied).

When assessing the conduct of the trial judge, on the other hand, the hearing judge concluded that the denial of the motion *in limine* was not in error:

> The Court finds that this is a bald allegation that is unsupported by Petitioner. Petitioner has not explained why Judge Williams was wrong in not suppressing the DNA PCR evidence. While Petitioner has referred the Court to *Williams v. State,* 342 Md. 724, 679 A.2d 1106 (1996), that case had not been decided at the time of Petitioner's trial. Based on the evidence presented to the trial court at the pretrial motion *in limine* hearing, *the trial court could have made an independent finding that this evidence should not be excluded.* Therefore, pursuant to *Johnson v. Warden of Md. Penitentiary,* 244 Md. 695, 223 A.2d 798 (1966), *this Court finds no trial court error.*

(Emphasis supplied).

Where is the prejudice in failing to appeal from an evidentiary ruling that did not constitute reversible error?

## B. Instance # 2:
### The Denial of the Motion *in Limine* on a Specific Ground

The second instance is nothing more than a slightly more specific rephrasing of the first instance. Whereas the first instance concerned the failure to appeal from the denial of the motion *in limine* generally, the second instance concerns the failure to appeal from the same denial on the specific ground that DNA results should not have been admitted absent accompanying population genetics statistics. Although there was no Maryland case law standing for any such principle and although there was no Maryland statute expressly discussing the subject, the hearing judge found that appellate

counsel was ineffective for failing to appeal from the denial of the motion *in limine* on that specific ground:

> Clearly, O'Neill felt that the DNA PCR results should not have come in without the population genetics statistics. When the trial court ruled against him, O'Neill should have raised the issue on appeal. The fact that *Armstead* had not yet been decided does not alter this conclusion because O'Neill knew the results would not be meaningful without the population genetics statistics. *Failure to raise this issue on appeal prejudiced Petitioner's appeal by precluding the appellate court from considering this issue in his case,* and resulted in ineffective assistance of appellate counsel.

(Emphasis supplied).

In the slightly different posture of finding whether the trial judge was in error for failing to grant the motion *in limine* on that specific ground, on the other hand, the hearing judge found no error:

> At the time of Petitioner's trial, *Armstead* had not been decided. Therefore, the trial court would not have been educated by case law to the necessity of the population genetics statistics to accompany the DNA PCR evidence. Therefore, *the trial court did not err in its ruling.*

(Footnote omitted; emphasis supplied).

Again, where is the prejudice in failing to appeal from an evidentiary ruling that did not constitute reversible error?

Both at the time of the evidentiary ruling on the motion *in limine* on November 29, 1994, and of the filing of this Court's opinion on February 26, 1996, the controlling law was *Jackson v. State,* 92 Md.App. 304, 324–25, 608 A.2d 782 (1992), which held that there was "no need for the State to offer additional evidence, such as probability calculations, to establish that the testing procedures employed were reliable." The trial court followed *Jackson,* as it should have, and this Court, had the case been before it, would have followed its own precedent in *Jackson.*

Although, to be sure, subsequent *dicta* in *Armstead v. State,* 342 Md. 38, 77–83, 673 A.2d 221 (1996), strongly indicated that population genetics statistics should be required (the actual holding of *Armstead* was simply that "the trial court did not abuse its discretion in admitting the statistical evidence"), the *Armstead* opinion, filed on March 20, 1996, did not come down until both the trial and the first appeal to this Court as a matter of right were completed.

At oral argument, counsel for Gross attempted to bring the appellate process under the umbrella of the *Armstead dicta* by suggesting that when *Armstead* was decided, on March 20, 1996, Gross's appeal was still within the time when Gross could have applied for *certiorari* to the Court of Appeals. The possibility of such discretionary review, however, does not implicate any Sixth Amendment right to the effective assistance of appellate counsel.

*Evitts v. Lucey,* 469 U.S. 387, 396–97 n. 7, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), established that the right to the effective assistance of counsel is dependent on the right to counsel itself. *Wainwright v. Torna,* 455 U.S. 586, 587–88, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982), and *Ross v. Moffitt,* 417 U.S. 600, 610–15, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), in turn, established that the right to appellate counsel only extends to a first appeal taken as a matter of right and not to subsequent discretionary appellate review. *Ross v. Moffitt* held specifically that the Sixth Amendment right to appellate counsel extended to an appeal as of right to the North Carolina Court of Appeals but did not extend to subsequent discretionary review by the North Carolina Supreme Court.

Even if there were, *arguendo,* some obligation on appellate counsel to predict a future change in the law, that obligation to prophesy, to the extent it would be grounded in the Sixth Amendment, would not have extended beyond February 26, 1996, the termination of the first appeal as a matter of right in this case. *Armstead v. State*'s disapproval of *Jackson v. State,* 342 Md. at 79 n. 32, 673 A.2d 221, did not

**578**

come until March 20, 1996, by which time both the trial and the appeal as a matter of right and all obligations pertaining thereto were terminated.[4]

---

4. A party to an appeal to this Court does, to be sure, have an opportunity, pursuant to Maryland Rule 8–605, to file "a motion for reconsideration of a decision" within a period of thirty days "after the filing of the opinion of the Court." In terms of applying the Sixth Amendment distinction between "appellate review as a matter of right" and "discretionary appellate review," this Court's action with respect to a Motion for Reconsideration falls clearly on the discretionary side of the line. We are legally obligated to consider the first appeal because an appellant is entitled to such a consideration as a matter of right. Beyond that, however, our election to reconsider a case once decided is as discretionary as is the election of the Court of Appeals to grant certiorari.

Our discretionary disposition of a Motion to Reconsider, moreover, is not *ipso facto* a reconsideration itself. It is only the threshold procedural decision of WHETHER TO RECONSIDER. If we grant the Motion for Reconsideration, that is not a decision of any sort with respect to the substantive merits of a case. All it does is bring those merits back onto the table for further debate and such further action, similar or dissimilar to what was done originally, that we ultimately deem appropriate. If, on the other hand, we deny a Motion to Reconsider, that means that we have, in our unfettered discretion, determined not even to entertain the merits a second time around.

Once we have initially closed the door, a party may ask us to exercise our discretion and reopen the door for further consideration. A party has no legal right, however, to require us to reopen the door. The Sixth Amendment right to the assistance of counsel, moreover, only extends as far as that absolute legal right to appellate consideration extends.

When we have issued an opinion in a case and have exercised our discretion not to reconsider that opinion, the subsequent filing of the Mandate is a *pro forma* exercise calling for no further input from counsel. As Judge Hollander explained in *McNeil v. State*, 112 Md.App. 434, 456, 685 A.2d 839 (1996):

[I]t is the date of filing of the appellate court's opinion that determines when the opinion is effective. *Firstman v. Atlantic Constr. & Supply Co.*, 28 Md.App. 285, 294 n. 12, 345 A.2d 118 (1975). "The mandate ... serves to direct the lower court to proceed according to its tenor and directions.... The opinion announces the law; the decision is expressed in the opinion; the mandate is the order issued on the decision."*Id. See also Harrison v. Harrison*, 109 Md.App. 652, 675 A.2d 1003 (1996). Similarly, in *Stewart v. State*, 287 Md. 524, 413 A.2d 1337 (1980), the Court determined that even if a mandate had not yet issued from this Court, affirming a waiver of jurisdiction order of the circuit court, the actions of the circuit court in accepting a subsequent indictment returned by the grand jury were not a nullity.

With respect to any obligation on appellate counsel to anticipate such a future change in the law, moreover, *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), could not have been more clear:

> It will often be the case that *even the most informed counsel will fail to anticipate a state appellate court's willingness to reconsider a prior holding or* will underestimate the likelihood *that a* federal habeas *court will repudiate an established state rule.* But as *Strickland v. Washington* made clear, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to *evaluate the conduct from counsel's perspective at the time."*

(Emphasis supplied).

## C. Instance # 3:
## The Refusal to Accept Dr. Walter Rowe As An Expert On DNA Evidence

 The third instance of alleged appellate ineffectiveness concerned the failure to appeal from the trial judge's refusal to accept Dr. Walter Rowe as an expert on DNA PCR evidence. With respect to appellate counsel, the hearing judge found:

> After the trial court ruled that Rowe was not qualified to testify as an expert on DNA PCR evidence, *O'Neill must have considered this an error,* since O'Neill held the opinion that Rowe was qualified. *He, therefore, should have raised the issue on appeal* and his failure to do so prejudiced Petitioner's appeal. Therefore, *the Court finds that appellate counsel's assistance was ineffective in failing to raise this issue on appeal.*

(Emphasis supplied).

With respect to whether the trial judge erred in having made such a ruling, however, the hearing judge found:

> After reviewing the pretrial motion *in limine* transcript, dated November 29, 1994, the Court finds that *the trial*

*court did not err in refusing to accept Rowe as an expert in DNA PCR evidence.* This Court has already found, under Petitioner's allegation of ineffective assistance of counsel, that *Rowe was not qualified to testify about DNA PCR testing.* Therefore, this Court finds that *the trial court did not err in refusing to accept Rowe as an expert in DNA PCR evidence.*

(Emphasis supplied).

Without suggesting for a moment that the wisdom of a particular appellate strategy needs any sort of appellate endorsement, we nonetheless note the wisdom of recognizing that evidentiary rulings on expert testimony, such as this, are reviewed by the highly deferential clear-abuse-of-discretion standard. In *Raithel v. State,* 280 Md. 291, 301, 372 A.2d 1069 (1977), Judge Levine pointed out that this is the type of trial decision with respect to which reversal is rare:

[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court, and *its action in admitting or excluding such testimony will seldom constitute a ground for reversal.*

(Emphasis supplied).

Yet again, where is the prejudice in failing to appeal from an evidentiary ruling that did not constitute reversible error?

### The Ultimate Lack of Prejudice: The Appellate Decision Would Not Have Changed

Had any of these three issues been before us on direct appeal, moreover, we do not hesitate to state that we would not have found reversible error with respect to any of them. There was, therefore, in the words of *Smith v. Robbins,* 528 U.S. at ——, 120 S.Ct. at 764, 145 L.Ed.2d at 780, no showing by Gross of "a reasonable probability that but for counsel's" failure to raise the issues, "he would have prevailed on his appeal." To wit, there was no possible prejudice.

## A HYBRID ISSUE:
## MIXING TRIAL PERFORMANCE WITH APPELLATE PREJUDICE

We initially expected that at this point we would be able to move from a consideration of the effectiveness of appellate counsel back to a consideration of the effectiveness of trial counsel by stepping from one neat and water-tight compartment of analysis into another. On closer examination, however, we are unable to do so. Two-thirds of what we expected to be a traditional examination of the effectiveness of trial representation with its two traditional components of trial performance and trial prejudice turns out to be a hybrid issue. It is also an issue of first impression in Maryland.

With respect to the performance component, we are, to be sure, required on these issues to examine the conduct at trial of trial counsel. As we turn to the prejudice component, however, we are called upon not to determine whether there was *Strickland*'s "reasonable probability" or *Oken*'s "substantial possibility" that the trial result would have been different but to determine instead whether there was *Smith v. Robbins*'s "reasonable probability" that, but for trial counsel's failure to preserve an issue for appellate review, Gross "would have prevailed on his appeal." We are looking for a reasonable likelihood of a different appellate result, not a different trial result.

Gross successfully urged on the post-conviction hearing judge three instances of alleged ineffective assistance of trial counsel. (There was also a fourth finding with respect to trial counsel's ineffectiveness but that simply concerned the cumulative effect of the first three such instances.) On close examination, however, it turns out that with respect to two of those three instances of alleged ineffectiveness, it was neither urged by Gross nor found by the hearing judge that there was any resulting prejudicial or adverse impact on the outcome of the trial itself. Both of those two alleged instances of ineffective assistance consisted only of counsel's failing to renew an earlier objection to evidence and failing, thereby, to preserve

those admissibility issues for subsequent appellate review. It is not even urged that the trial result might have been different.

The two closely intertwined issues concern the admissibility of evidence of Cellmark Diagnostic's DNA PCR examination. The first concerns the admissibility of DNA PCR evidence generally because of the absence of any express statutory *imprimatur* or any earlier case law approving such admissibility. The second closely related issue concerns the admissibility of DNA PCR evidence on the specific ground that, even if otherwise admissible, it may not be admitted in the absence of contextual genetic population statistics.

The overarching trial reality is that Gross's lawyer strenuously opposed the admissibility of the DNA PCR evidence, both on general grounds and on the more specific ground. Two related Motions *in Limine* were made immediately prior to the commencement of the trial. The joint hearing on those motions consumed most of November 29, 1994. The motions were denied and the trial judge ruled that the evidence was admissible.

The two instances of ineffectiveness found by the post-conviction hearing judge do not concern any failure of trial counsel to challenge the evidence on November 29. Both findings of ineffective trial performance involve only the failure of counsel formally to renew the objection on December 5 when Melissa Weber, the Senior Molecular Biologist at Cellmark Diagnostic, testified about the DNA PCR examination. There is no suggestion that the trial judge was going to rethink on December 5 his earlier ruling of November 29. There is no suggestion that trial counsel should have asked for a rehearing on the Motions *in Limine* in the light of additional evidence. The only finding with respect to ineffectiveness was that counsel, by failing formally to renew the objection, failed to preserve those twin issues of admissibility for subsequent appellate review.

The limited nature of the finding of ineffectiveness was unambiguously clear. The Memorandum Opinion and Order of the hearing judge expressly found:

This Court read the transcript and finds that *O'Neill failed to object* at trial to the admission of DNA PCR testing. *He, therefore, did not preserve the issue for appeal.*

\* \* \*

The Court finds that *O'Neill's failure to object* at trial to the use of DNA PCR testing amounts to a deficient performance.

*As a result* of O'Neill's failure to object to the DNA PCR testing, *the issue was waived for appeal purposes.*

\* \* \*

In addition, the Court finds that *there is no rational trial strategy for failing to preserve the issue for appeal.* This prejudiced the Petitioner in that *the issue was not preserved for appeal.* Therefore, this Court finds that counsel's assistance was ineffective as it relates to this issue.

(Emphasis supplied).

The limited nature of the second and closely related finding is also unambiguously clear. The Memorandum Opinion and Order of the hearing judge expressly found in that regard:

O'Neill never made any objection at trial to the introduction of the DNA PCR evidence when witnesses testified to the results. This amounts to a deficient performance.

. . .

[T]he Court finds that *he should have objected to the introduction of this evidence at trial so as to preserve the issue for appeal.* The fact that the Court in *Armstead* later ruled in conformity with O'Neill's argument shows there was a reasonable probability that the outcome of Petitioner's case would have been different. Therefore, *O'Neill's failure to preserve this issue was prejudicial* to Petitioner's

case, and supports the claim of ineffective assistance of counsel.

(Emphasis supplied).

After a hotly contested hearing, the trial judge's ruling on the admissibility of the DNA PCR evidence had been made on November 29. The mere failure, six days later, to lodge a passing and *pro forma* renewal of that objection, whatever effect that failure may have had on a later appeal, obviously had no effect on the outcome of the trial itself. There was self-evidently no "reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. There was nothing "to undermine confidence in the outcome" of the trial. *Id.* In terms of any possible effect on the outcome of the trial *per se*, the renewal of the objection would have been nothing more than a procedural hiccough or a clearing of his throat by counsel. It was a gesture that would not even have been noticed, except by the record.

In the last analysis, however, there is no logical reason why there cannot be a hybrid ineffective assistance problem and no logical reason why we, if we are conscious of what we are doing, cannot engage in a hybrid analysis. It is entirely conceivable that a deficient performance by trial counsel could produce appellate prejudice even in the absence of trial prejudice. A classic instance would be where trial counsel deficiently fails to preserve for appellate review an issue that would have had "a reasonable probability" of success at the appellate level, had it been preserved.

If the prejudice component of the analysis, however, is of the appellate variety rather than of the trial variety, *i.e.*, it impacts adversely on the appellate process rather than on the trial process, that raises the obvious question of choosing the appropriate relief. We must, in the words of Judge Bell in *Williams v. State*, 326 Md. at 382, 605 A.2d 103, make certain that the relief granted is "tailored to fit the circumstances of the case."

In this case, the primary relief granted by the post-conviction hearing judge was the awarding to Gross of a new trial. That relief was based upon three specific findings of ineffectiveness on the part of trial counsel plus a fourth finding dealing cumulatively with the other three. Our recognition of the hybrid nature of the first two such instances of allegedly deficient performance by trial counsel, however, points out the inappropriateness of the relief granted. Even if we were to assume, *arguendo*, that the hearing judge were correct in finding that trial counsel was deficient for failing to preserve two issues for appellate review, the awarding of a new trial would not logically follow from such findings. The dots do not connect.

A finding that trial counsel was deficient for failing to preserve an issue for appellate review presupposes 1) that competent appellate counsel would have chosen to raise such an issue, had it been preserved, and 2) that the issue had a reasonable probability of being successful on appeal. The ultimate prejudice would be in the unfair denial of highly desirable appellate review. The obvious cure for such a denial would be, by way of belated appeal, to permit the appellate court to consider an issue that should have been considered by it and would have been considered by it but for the non-preservation. The logical remedy is to provide the thing that was denied. The granting of a new trial, nonsensically, would actually foreclose such a logical and obvious remedy. It would presume to decide for the appellate court the very thing it was decided that the appellate court should have been permitted to decide for itself.

The sweeping grant of a new trial as a cure for a very discrete and limited problem might, moreover, turn out to be Pyrrhically excessive. If the relief were properly "tailored" to cure the defect and if the appellate court were allowed belatedly to consider what it should have considered earlier, there is no guarantee, of course, that the appellate court would decide in the defendant's favor. If on the ultimate merits it should end up affirming the decision of the trial court, as well

it might, then self-evidently there would have been no reason why the verdict of the trial court should ever have been vitiated. The wholesale wiping out of the first trial might turn out to have been completely in vain.

In this case, moreover, it follows that if these two hybrid instances of allegedly deficient performance by trial counsel would not support the awarding to Gross of a new trial, then neither would the fourth and cumulative instance. If the third instance is all that remains to a true claim of ineffective assistance of counsel at the trial level having a prejudicial impact at the trial level, then it self-evidently has no "cumulative" effect beyond itself but must rise or fall on its own.

Even if, however, the nature of these two hybrid claims—impacting, as they do, only on the appellate process—erodes their efficacy to provide a basis for awarding a complete new trial, there is still no reason why they could not serve, should they be found to have merit, as the basis for the alternative and conditional relief of a belated appeal. We turn now, therefore, to a consideration of their merits in that latter and lesser capacity.

## THE TWO HYBRID ISSUES:
## THE PERFORMANCE COMPONENT AT THE TRIAL LEVEL

As we look at the performance component of counsel's conduct of the trial, we are not concerned with whether he fought or acquiesced in the admission of the DNA PCR evidence. He fought it, timely and strenuously, by filing the Motion *in Limine* and at the hotly contested hearing thereon. The only issue here is whether his performance was deficient six days later in failing formally to renew an objection to the evidence and in failing thereby to preserve the issue for appellate review.

### A. Not Objecting As a Part of Gamesmanship

Our first observation is of only minimal significance but is nonetheless worth noting. Having fought a battle in front of

the judge alone and having lost it, it is frequently deemed wise not to renew the battle in front of the jury. The battle is still going to be lost and it may be discreet not to identify oneself with a losing cause. Trial attorneys are actors and the substance of what they do is sometimes deliberately sacrificed to the impressions they convey. If in the eyes of the jury, the lawyer bleeds a little bit every time one of his objections is overruled, he soon learns not to make objections that he expects to be overruled.

To have objected to the DNA PCR evidence might have given the jury the impression that, in counsel's mind at least, the evidence was harmful to Gross's defense. Counsel might thereby have enhanced the significance of the thing he opposed. To have appeared blithely indifferent to its admission, on the other hand, may have conveyed the counter impression that the evidence did not amount to anything, one way or the other. Gamesmanship is just another name for trial tactics.

This, we repeat, is just a passing observation. Could the same objection have been discreetly lodged at the bench? Md. Rule 4–323(a). Of course, if there were any compelling reason to do so. Could counsel earlier have requested a continuing objection? Md. Rule 4–323(b). Of course, if there were any compelling reason to do so. We now point out why there was no compelling reason to do so.

### B. Not Objecting to a Ruling That Is Correct: Sub–Issue # 1

A more significant reason for not objecting is because there is no sound legal reason for doing so. One need not object at trial if the correct trial ruling, on the merits, ought to be the overruling of the objection. One need not preserve for appellate review, moreover, an issue that, on its merits, does not deserve to prevail on appeal. In examining the merits of these two closely related sub-issues, it behooves us to look at them separately. On the merits of the general objection to DNA PCR evidence, there is no merit.

Although the fact that the trial decision under scrutiny took place in 1994 makes no difference to the outcome of our

analysis (indeed, the law supporting the admissibility of DNA PCR evidence becomes stronger and clearer with every passing year), we nonetheless point out, for the guidance of future analyses, that we will scrupulously assess the effectiveness of counsel's trial performance in the context of the state of the law as it existed at the time of trial, November 30 through December 7, 1994.

In examining the effectiveness of trial counsel's 1994 performance, we point out that the cases of *Armstead v. State*, 342 Md. 38, 673 A.2d 221, filed on March 20, 1996, and *Williams v. State*, 342 Md. 724, 679 A.2d 1106, filed on July 30, 1996, were still part of some distant and unforeseen future and have no business even entering into the present analysis or discussion of this case. Although neither of those cases would have altered the analysis we make, even if hindsight were permitted, we nonetheless vehemently remonstrate against their very mention because a *post-hoc* peek at the case law of 1996 is utterly taboo in evaluating what a lawyer did in 1994. The effective assistance of counsel does not demand a crystal ball. *Strickland*, instead, commands that we "eliminate the distorting effects of hindsight" and "evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689, 104 S.Ct. 2052. Even if *Armstead* and *Williams* had changed the law (they did not), *State v. Calhoun*, 306 Md. at 735, 511 A.2d 461, nonetheless made it clear that "counsel must be judged upon the situation as it existed at the time of trial" and that there is "no duty on counsel to foresee" a change in the law. *See also Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986)("It will often be the case that even the most informed counsel will fail to anticipate a state appellate court's willingness to reconsider a prior holding.") In fact, there was no change to be foreseen, but that is not our point. *Strickland* does not endorse the H.G. Wells approach, regardless of what the journey in the time machine might reveal.[5]

---

5. Quite aside from the prohibition on subjecting counsel's performance to the "distorting effects of hindsight," Gross attempts to push his Sixth

██ Returning to the merits of the admissibility ruling of November 29, 1994, as of that time Courts and Judicial Proceedings Article, § 10–915 expressly provided that DNA RFLP analysis was admissible in evidence. As to the newer and less probative DNA PCR analysis, the thing in issue in this case, the Maryland statute was silent. The statute did not authorize its admissibility. Neither did it preclude its admissibility. No Maryland appellate opinion had ever dealt with, or even mentioned, DNA PCR analysis. Under such circumstances, the State, wherever it seeks to use a new and unsettled scientific technique, has the burden of satisfying the court, after a full evidentiary hearing, that such a technique has achieved a level of general acceptance in the pertinent scientific community according to the standards set out in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923) and *Reed v. State*, 283 Md. 374, 379–89, 391 A.2d 364 (1978).[6]

██ In full recognition of that state of the law, Gross's counsel filed a Motion *in Limine* to exclude the evidentiary use of the new and still unsettled technique and properly put the State to its burden of satisfying the *Frye-Reed* test. At the hearing on November 29, 1994, the State did just that and the judge properly denied the Motion *in Limine*. There were no apparent problems with the way the *Frye-Reed* hearing

---

Amendment claim too far in the other direction. While acknowledging that the opinion of this Court was filed a month before *Armstead* was decided, he nonetheless argues that he was still within the time period for petitioning for *certiorari* to the Court of Appeals and could have made a still timely claim based on *Armstead* in that petition. He conveniently forgets that his Sixth Amendment right to the effective assistance of counsel did not extend beyond his first appeal as a matter of right to this Court. *Evitts v. Lucey*, 469 U.S. 387, 396–97 n. 7, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Wainwright v. Torna*, 455 U.S. 586, 587–88, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982); *Ross v. Moffitt*, 417 U.S. 600, 610–15, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). The Sixth Amendment window slammed shut on February 26, 1996.

6. Before ch. 430 of the Acts of 1989 approved the reception of DNA evidence generally and before ch. 631 of the Acts of 1991 approved DNA RFLP evidence specifically, the *Frye-Reed* test was the necessary threshold that had to be crossed. For such a crossing, *see Cobey v. State*, 80 Md.App. 31, 34–43, 559 A.2d 391 (1989).

was conducted and there was, therefore, no sound legal basis for renewing an objection to the introduction of the evidence on December 5.

The situation in this case was replicated precisely by what this Court, speaking through Judge Alpert, held to be a perfectly proper procedure in *Chase v. State*, 120 Md.App. 141, 153, 706 A.2d 613 (1998):

[A]ppellant argues that the circuit court erred by admitting the DNA evidence in this case because that evidence was developed through polymerase chain reaction (PCR) techniques. According to appellant, at the time of trial, Md. Code, § 10–915(b) of the Courts and Judicial Proceedings Article only allowed DNA evidence developed through fragment length polymorphism (RFLP) analysis to be used to identify a defendant. We disagree.

As the Court of Appeals recognized in *Armstead v. State*, 342 Md. 38, 673 A.2d 221 (1996), § 10–915 essentially eliminates the need for a court to conduct an inquiry into the general acceptance of the DNA techniques listed therein. *Id.* at 66, 673 A.2d 221. Such an inquiry would otherwise be required pursuant to *Reed v. State*, 283 Md. 374, 381, 391 A.2d 364 (1978). *Id.* at 54, 673 A.2d 221. *This,* however, *does not mean that DNA evidence not included in § 10–915 is inadmissible. It simply means that that evidence must be subjected to the inquiry outlined in Reed before it may be admitted.*

*Here, the circuit court conducted such an inquiry, and it* ultimately *concluded that PCR evidence is admissible.* Thus, *we perceive no error* in the lower court's admission of that evidence.

(Emphasis supplied). *See Armstead v. State*, 342 Md. at 54, 673 A.2d 221 and *Williams v. State*, 342 Md. at 752, 679 A.2d 1106.

Counsel's reason for having put the State to its *Frye-Reed* burden in the first place reveals sound tactical thinking. Even if counsel believed, as he did, that the DNA PCR evidence would ultimately be found admissible, he was still not going to

concede anything. Like a good debater for the negative, he chose to put the affirmative to the burden of its proof. Purely as an opportunist, he could simply sit back and watch to see if the proponent of the new technique then failed, *a la* Fred Merkle,[7] to touch one of the required bases.

I wasn't going to let any piece of evidence go unchallenged. I mean, that was the whole purpose of trying to challenge at the *Frye-Reed* hearing. *State has the burden, let them go forward. Let them try to prove it.*

(Emphasis supplied).

Counsel revealed that even if the DNA PCR evidence were concededly admissible, there were still sound tactical reasons for putting the State to its burden of proof.

*[I]t gave us an opportunity to have one of the State's experts on the witness stand, an opportunity to question her* with regard to this case, to lock her into certain testimony, and *to me that's a strategic advantage* in this case. I felt that the State had the burden of establishing that. I wasn't going to simply roll over and stipulate that it should be admissible ... *I wanted the State to prove every bit of the case and that was something they had to prove.*

(Emphasis supplied).

Although Gross's trial counsel properly put the State to its burden of proof on satisfying the *Frye-Reed* test and establishing thereby the admissibility of the DNA PCR evidence, he concluded that the State had, indeed, satisfied the test and that the denial of his Motion *in Limine* was, therefore, correct. Under those circumstances, there was no sound basis for renewing the objection six days later.

### C. Not Objecting to a Ruling That is Correct: Sub–Issue # 2

 Of the two closely related issues that we have characterized as hybrid (an alleged deficiency in trial performance

---

7. Merkle's failure to touch second base on September 23, 1908 cost the New York Giants the National League pennant. The Chicago Cub who spotted the oversight was Johnny Evers of "Tinker to Evers to Chance."

producing alleged appellate prejudice), the second is that Gross's attorney failed on December 5 to object to the introduction of the DNA PCR evidence of "non-exclusion" on the specific ground that such evidence is *per se* inadmissible in the absence of interpretive population genetics statistics.

In the second of his two Motions *in Limine* that were made and resolved on November 29, Gross's attorney did object to the admissibility of the DNA PCR evidence on precisely that ground. He argued that without the accompanying interpretive data, the DNA PCR evidence by itself lacked relevance. That, of course, is just another way of expressing the proposition that without the accompanying interpretive data, the evidence is inadmissible. After a full hearing, the trial judge ruled against Gross in that regard and denied both Motions *in Limine.* Gross's argument and a critical finding by the post-conviction hearing judge was that that evidentiary ruling by the trial judge on November 29 was wrong and that the failure of Gross's lawyer to renew the objection on December 5 meant that the November 29 ruling was not preserved for appellate review.

On this sub-issue we are troubled. Let it be clear at the outset that we are not troubled in reaching our decision on the *Strickland v. Washington* issue. We are only troubled in attempting to write an opinion to explain that decision on this sub-issue. We are unsure as to what possible pertinence population genetics statistics might have in this case. We are unsure because we have not been presented with any clear and uncluttered statement as to possible pertinence. We have flights of logic galore, facilely attributing 1996 suggestions in the case law to the anticipatory obligation of counsel in 1994, facilely jumping from the context of DNA RFLP analysis to the context of DNA PCR analysis, and facilely applying principles that apply to a DNA "match" to evidence of something other than a DNA "match." We are not as adept at such sleight-of-hand and are looking for more certain guidance.

Our frustration in terms of such guidance is plenary. We are frustrated by the transcript of the original trial, by the

opinion of this Court on direct appeal, by the transcript of the Post–Conviction Relief hearing, by the Memorandum Opinion and Order of the hearing judge, by the briefs on this appeal, and by oral argument alike, because none of them tells us what we would like to know about the relationship, if any, between population genetics statistics and "non-exclusion." We suspect that the fault lies not in any of the persons who produced that otherwise highly professional material but in the uncertain and ambiguous nature of the law itself. We find nothing in the Maryland case law or the statute law right up to the present to resolve this uncertainty and ambiguity.

Forgetting for a moment any problem of attributing an anticipation of present knowledge to counsel in 1994, even the present knowledge leaves us in a state of profound doubt. Even if we were willing to impose upon counsel in 1994 an obligation to anticipate future changes in the law, we are by no means certain what it is that he could have anticipated. Three Maryland cases have dealt with the subject of population genetics statistics. They are: *Jackson v. State*, 92 Md.App. 304, 321–25, 608 A.2d 782, *cert. denied* 328 Md. 238, 614 A.2d 84 (1992); *Keirsey v. State*, 106 Md.App. 551, 567–76, 665 A.2d 700 (1995); and *Armstead v. State*, 342 Md. 38, 67–83, 673 A.2d 221 (1996). Only two of those, *Keirsey* and *Armstead*, undertook to provide any explanation of what the subject of population genetics statistics is all about.[8]

Significantly, all three of those cases dealt with DNA RFLP analysis. All three of those cases, moreover, dealt with evidence that established a "match." This case, by contrast, deals with DNA PCR evidence and the evidence in this case did not establish a "match." Neither *Jackson* nor *Keirsey* nor *Armstead* even mention DNA PCR evidence. Neither *Jackson* nor *Keirsey* nor *Armstead* even deal with a situation where no "match" was made.

---

**8.** The leading discussion is clearly that in *Armstead*. Most of the *Armstead* discussion, however, deals with the relative merits and demerits of using the so-called "product rule" rather than the so-called "ceiling principle" and the related problem of selecting the appropriate database, problems that do not concern us in this case.

Counsel for Gross, however, suggests to us that there is no logical reason why what the case law says about DNA RFLP evidence should not apply to DNA PCR evidence as well. We would find that logic persuasive, if a proviso were added. If DNA PCR evidence should, either in the present or at some future time, establish an actual "match," we would see no reason why the population genetics statistics that are helpful (or perhaps necessary) in interpreting an RFLP "match" would not be equally helpful (or perhaps equally necessary) in interpreting a PCR "match." In terms of the pertinence of population genetics statistics, the significant dividing line may be not between RFLP analysis and PCR analysis but between those cases establishing a "match" and those cases establishing something other than a "match."

In the case of a "match," the value of the interpretive data seems clear. If the DNA of a defendant matches the DNA of the perpetrator of the crime, how significant is that "match"? What are the odds against two persons having the same DNA signature? In this regard, DNA "fingerprinting" is much like traditional fingerprinting, three-quarters of a century later. In the early days of the forensic use of traditional fingerprinting, courts needed the benefit of interpretive studies. An FBI expert was required to point out that the odds were a billion or more to one that two people would not have precisely the same fingerprint. We are now sufficiently indoctrinated that we do not need the contextual background and fingerprint identification is accepted as a mathematical certainty.

With the newer phenomenon of DNA "fingerprinting," by contrast, the contextual background is still necessary. If a DNA "match" is made, what is the significance? The discussion by Judge Murphy (now Chief Judge) for this Court in *Keirsey v. State,* 106 Md.App. at 567, 665 A.2d 700, makes clear the value (or necessity) of the contextual statistics when evaluating a "match":

> The statistical probability analysis attempts to answer the question, *"What is the likelihood that a person other than the defendant has the same DNA as the perpetrator?"* ...

*"A match is virtually meaningless without a statistical probability expressing the frequency with which a match could occur."* State v. Vandebogart, 136 N.H. 365, 616 A.2d 483, 494 (1992). That is why it is misleading to suggest that the RFLP test produces a "fingerprint." *That is also why a statistical probability analysis is necessary to determine the chance that some other person chosen at random from the general population has DNA that matches the defendant's DNA.*

(Emphasis supplied).

Although *Armstead*'s discussion of population genetics statistics, 342 Md. at 77–83, 673 A.2d 221, dealt with the admissibility of such statistical data rather than the indispensability of such data as a *sine qua non* for any DNA testimony, the entire discussion was in the exclusive context of a DNA "match." "[T]here are several indications in the statute that the Legislature also intended the supporting statistics to be routinely admitted along with the DNA *match* evidence." 342 Md. at 77, 673 A.2d 221. The Legislature had an awareness "that there is some possibility of random *matching*." 342 Md. at 78, 673 A.2d 221. "[T]he odds of random *matching* would be at issue whenever DNA evidence was presented." *Id.*

*Armstead* quoted with approval the report of the National Research Council, "To say that two patterns *match,* without providing any scientifically valid estimate . . . of the frequency with which such *matches* might occur by chance, is meaningless." *Id.* It cited *United States v. Yee,* 134 F.R.D. 161, 181 (N.D.Ohio) (1991), for its statement: "If random DNA *matching* is possible, then a '*match*' between two DNA profiles is not meaningful without contextual statistics regarding the odds that the *match* was coincidental." 342 Md. at 79, 673 A.2d 221. "The General Assembly recognized the possibility of random *matching* . . .; therefore, in rendering DNA evidence admissible, we conclude that the Legislature intended to render the necessary contextual statistics admissible, not just the 'raw' evidence of a DNA *match*." *Id.* "We believe . . . that the better approach is to treat the *match* and the statistics as

inseparable components of DNA evidence." *Id.* (All emphases of the word "match" supplied).

Gross does not simply gloss over the possible difference between evidence of a DNA "match" and DNA evidence of something other than a "match." Throughout his argument, he quotes case law dealing with a "match" and then, subconsciously or disingenuously, equates the case law's "match" with the "non-exclusion" in this case, with no acknowledgment that the two are not the same. We are not prepared, on the basis of what has been presented to us, to make so uncritical a leap of faith.

A DNA "match" can be an ultimately damning item of proof and the value of the interpretive statistics seems clear. We do not, however, see a necessary logical connection between evidence of a "match" and evidence that merely establishes "exclusion or non-exclusion." Indeed, in the case of exclusion, it would seem that contextual statistics would be meaningless. If a person is excluded, that is an absolute non-identification and population genetics statistics would seem to be beside the point.

A "non-exclusion" would seem to lie at some intermediate but indeterminate spot between an "exclusion" and a "match." It would seem that the answer of the examiner would be to the effect, "From the small sample we have, we have not seen a difference and cannot, therefore, announce an exclusion. On the other hand, we have not seen enough similarities to announce a match." What is the significance of a "non-exclusion"? Are population genetics statistics, even as of today, necessary to interpret a "non-exclusion"? Are they even helpful? Even if helpful, are they legally required as a pre-condition of admissibility? We do not know the answer. We are relieved that in this case we are not required to come up with an answer.

Indeed, the guidelines of the National Research Council, the prevailing scientific and forensic guidelines at the time of Gross's trial, indicated that population genetics statistics were relevant to the interpretation of test results only when a

"match" was declared and then to answer the question: "What is the chance of picking at random a person who has the same genetic patterns as found in the evidence sample?" Committee on DNA Technology in Forensic Science, National Research Council, *DNA Technology in Forensic Science* (1992)(Prepublication Manuscript) 1–10. That is not the sort of question that would be asked about a mere "non-exclusion."

In yet another regard, Gross's argument is flawed. Even if we were to assume, *arguendo,* that *Armstead*'s well-considered *dicta,* 342 Md. at 79–80, 673 A.2d 221, applied to DNA evidence of "non-exclusion" as surely as it applies to evidence of a "match," that was not the controlling law in November and December of 1994. The controlling authority was *Jackson v. State,* 92 Md.App. 304, 324–25, 608 A.2d 782, *cert. denied* 328 Md. 238, 614 A.2d 84 (1992). Jackson had argued that

> without proper evidence regarding the probability of a match, evidence that a match was declared has no relevance. Without probability calculations the fact that there was a match does not tend to make it more or less likely that [a]ppellant was the assailant.

92 Md.App. at 324, 608 A.2d 782.

In addition to holding that the issue had been waived, this Court went on to state that "[t]here was simply no need for the State to offer additional evidence, such as probability calculations, to establish that the testing procedures were reliable." *Id.* Under *Jackson,* the trial judge's denial of the Motion *in Limine* on November 29 was not in error. There was no sound legal reason, therefore, for counsel to renew the objection to the evidence on December 5. That is the law that trial counsel and trial judge alike were bound to follow in 1994 and that is the law that we ourselves would have followed had this issue been before us on the direct appeal on which we filed our own opinion on February 26, 1996.

In assessing counsel's reliance on *Jackson v. State* as an accurate statement of the controlling law to be followed, we bear in mind the direction of *Strickland* "to evaluate the

conduct from counsel's perspective at the time," 466 U.S. at 689, 104 S.Ct. 2052, and *State v. Calhoun*'s command that "counsel must be judged upon the situation as it existed at the time of trial," 306 Md. at 735, 511 A.2d 461.

### D. Not Objecting to a Ruling for Strategic Purposes: Sub–Issue # 2

On this sub-issue, we will indulge Gross, tentatively, with an assumption in his favor. We will assume, *arguendo*, that population genetics statistics could be of significant value in interpreting the significance of even a "non-exclusion." It would seem that without the interpretive statistics, evidence of "non-exclusion" would be so insignificant as to be virtually meaningless. With the support of interpretive data, on the other hand, such evidence could take on greater probative value. The State would clearly seem to be the beneficiary of the interpretive statistics. In this case, the State did not enjoy such a benefit.

It seems to us that the evidence of "non-exclusion" in this case, without any interpretive statistics, was of such minimal probative value as to have been insignificant. When the trial judge denied Gross's Motion *in Limine* on November 29, 1994, his announcement of his decision highlighted the extremely minimal value of "non-exclusion" without more:

> I think that PCR testing has been accepted by the scientific community for what it is.... *[I]t's not the type of test that would specifically link the Defendant as the perpetrator of the crime, and it's not intended to do that,* and I think they've taken great pains to show that *that's not what it's intended to do.* What it does do is include or exclude from ... the results of the test the DNA that's attributable to the Defendant.
>
> ... [I]t's just like blood tests that ... aren't specifically aimed at ... a Defendant to [a one] hundred percent [certainty to] say, "[H]e's the one that did it," but he fits within a category of those that could have done it, that's evidence. Now, you may have other evidence that you have

to have, and certainly in a criminal case you have to have a lot of evidence to show that the Defendant does something. But *I don't think just because this particular evidence doesn't show it conclusively that you rule out the evidence.* That's all part of the package that the State's allowed to present.

So *I see nothing wrong with the DNA evidence coming in, as long as it's clear that it's not to be accepted as a . . . fact . . . that specifically points to this Defendant, because it doesn't.* All it does is include him in the category of people that could have been . . . whose sample it could have been.

(Emphasis supplied).

After losing the Motion *in Limine,* trial counsel immediately reversed his field. Initially, he had opposed the admission of the DNA PCR evidence without supporting statistics. At trial, however, he sought to prevent the State from offering such statistics. For various reasons, no such statistics ever came in. In a variation on the theme of not renewing the objection on December 5, the post-conviction hearing judge took counsel to task for the switch and found that counsel's second position amounted to a waiver of his earlier position:

O'Neill made a pre-trial motion *in limine* to exclude DNA evidence. The court denied that motion. O'Neill then made a second motion *in limine* at trial to preclude the State from offering any population genetic statistics. The Court finds that O'Neill's second motion *in limine* amounts to a waiver of the pretrial motion *in limine.* Initially, O'Neill did not want any DNA evidence to come in without the population genetic statistics. However, when this motion was unsuccessful, he then moved to preclude the State from presenting any such evidence.

The hearing judge then ruled that that waiver of the earlier objection "amount[ed] to a deficient performance" because the issue was not preserved for appellate review.

We conclude, quite to the contrary, that counsel's flexibility was imaginatively adroit. Having lost the battle to keep the

DNA PCR evidence out, he turned defeat into quasi-victory by denying the evidence any significance. On cross-examination of the State's DNA expert, counsel got her to admit that she "did not feel the evidence was strong enough to report the genotype frequencies." Counsel "milked" a difficult situation to maximum advantage. This quick adjustment to seeming adversity was counterpunching at its best.

### E. Not Objecting to Evidence That Is Not Harmful: Both Sub–Issues

With respect to both sub-issues, another very cogent and persuasive reason for not objecting when the DNA PCR evidence was introduced on December 5 is that the evidence did not in any way hurt the defense case and was, indeed, completely compatible with the defense version of events. It showed that at some time shortly prior to Peggy Courson's death, Gross **COULD HAVE BEEN** in sexual contact with her, to wit, he was **NOT EXCLUDED** as a possible donor of a DNA sample revealed by a vaginal swab. Gross took the stand, of course, and testified that he had had sexual intercourse with Peggy Courson within twenty-four hours of her death.

With respect to the relative insignificance of the DNA PCR "non-exclusion" evidence as a totality, the testimony of Gross's lawyer at the post-conviction hearing places it in realistic perspective:

Q: When Judge Williams ruled that the PCR testimony that the Defendant could not be excluded was admissible, did you feel ... it would have significant ... impact on the outcome of the case?

A: No, because I was aware that Alvin was going to testify, at least from a strategic perspective, we anticipated that he was going to testify. I did not believe it was a significant issue in the case.

At the hearing on his Petition for Post–Conviction Relief, on the other hand, Gross himself strained to preserve for the issue a shred of possible prejudice by claiming that but for the

DNA PCR evidence, he would never have taken the stand and made the damaging admission as to sexual contact with Peggy Courson. The whole thrust of this position is Gross's effort to forfend the State's argument that Gross's testimony rendered moot the entire question of the admissibility of the DNA PCR evidence, to wit, rendered moot Gross's entire Petition for Post–Conviction Relief.

At the post-conviction hearing, Gross's attorney firmly maintained that it was always the settled defense strategy that Gross would take the stand and testify as he did:

> [A]s trial counsel, and [as] certainly the ... attorney who had the most contact with Mr. Gross, I knew ... what his desires and wishes were and *his desires and wishes were to testify.* ... I didn't think that in the middle of trial Mr. Gross was going to change his decision. Certainly he has the prerogative to do that, and you're right, it is absolutely his decision. But *from the standpoint of ... trial strategy ... there was no question I believed Mr. Gross was going to testify.*

(Emphasis supplied).

The hearing judge pointed out that at the moment when counsel declined to make an objection on December 5, the final decision to take the stand had not yet been made:

> At the point this evidence was admitted, Petitioner had, of course, not testified, and Petitioner and his counsel still had plenty of time and opportunity to evaluate or reevaluate whether Petitioner should testify.

That, of course, is a truism. The defendant, whose decision it unquestionably is, does not pass the decisional point of no return until the literal moment he takes or declines to take the stand. A trial strategy, on the other hand, has frequently been developing well before that point, as it was in this case. Even though the ultimate decision may be in the hands of the defendant, we, in assessing the wisdom of a trial strategy, are more focused on the mind of trial counsel. We are interested in his reasonable perception of the decision that should and

presumably will be made. Counsel made his perception very clear:

> *[F]rom day one ... we all believed that Mr. Gross was going to testify. ... Alvin wanted to testify.* Alvin wanted an opportunity to respond to these allegations. He had never had that chance. *Alvin wanted to talk about issues pertaining to Troy King. ... I think Alvin needed to testify* as it related to the alibi and to go through the specifics of his whereabouts the evening that she was killed. ... *[I]t was never considered that Alvin would not testify. He had no criminal record* that was going to be admissible against him that would somehow damage his credibility. *Alvin is a very believable person* and *I ... believe that he made a good witness.*

(Emphasis supplied).

What is also clear is that the trial decision to put Gross on the stand was an imperative strategy to attempt to counteract the hair and fiber evidence that indisputably put Peggy Courson in Gross's automobile at some time not long before her death. The DNA PCR evidence, for its part, added almost nothing to the certainty of that fact. There was also a strategic necessity to have Gross explain away, if he could, the testimony of both King and Carpenter as to his possession of the .32 caliber revolver that could have been the murder weapon. As counsel explained, Gross "had no criminal record that ... would damage his credibility" and he was, in counsel's judgment, "a very believable person" who would "make a good witness." Without some explanation by him of those very incriminating facts, the defense would have been no defense at all. Defense counsel explained, first with respect to physical evidence in and from the car, what seems to us to have been sound strategic thinking:

> [T]he way I looked at it, *Alvin needed to explain the pubic hair. Alvin needed to explain the head hair. Alvin needed to explain the fibers from the `... mat of the car* and there [were] other additional fibers ... The notebook and the fingerprints. *There [were] seven independent pieces of evidence linking him to this victim above and beyond the*

*issue of the DNA.* So I think unless there was some compelling reason not to put Alvin on the stand, and *I didn't know of any reason to not put him on the stand,* coupled with the fact that he wanted to testify. I mean, you know, he runs the show here. I mean, we certainly guide him along the way, but . . . he wanted to take the witness stand. He said, that's what I want to do. I want to tell these people what had occurred. So I mean, that was why we obviously allowed him to do what he wanted to do. *More importantly, I think he had to,* I mean, in my estimation. I mean, and I also think it made sense for the jury to hear from this gentleman. . . . *Alvin is a good-looking man. He's articulate.* He comes from a good family. *He makes a good witness* and I think that he made a good witness. You know, *that was the assessment I think of everybody who was handling this case.*

(Emphasis supplied).

A second reason dictating that Gross had to take the stand was the necessity to place some spin on his confession of murder, not to the police but to his best friend:

Q: Did you also feel that he needed to explain in some form Troy King's statement where he admitted to shooting the victim?

A: Oh, *no question.* . . . *Troy King is his best friend.* . . . Troy King and he were extremely close, . . . they hung out together, they talked daily, although that had been strained in some respect because Troy King had moved. So *here you have a situation where his best friend essentially is coming in to testify against him* and *I think there had to be some explanation for that,* that *no one else* that I was aware of *could offer any rational explanation for [that] other than* . . . *Mr. Gross.*

(Emphasis supplied).

Yet a third reason dictating that Gross should take the stand was the necessity of supplying some explanation as to why he had been in possession of the .32 caliber revolver that could well have been the murder weapon:

Q: And did you also feel that he needed to explain the fact that he had showed Mr. King and Mr. Carpenter the gun?

A: Well, *undoubtedly.* . . . I mean, *there's a multitude of reasons why we would want him to testify* and that was certainly one of the factors.

(Emphasis supplied).

We cannot credit the speculative conclusion that but for the trial judge's denial of the Motion *in Limine* with respect to the DNA PCR evidence, Gross would not have taken the stand in his own defense. More pertinently, from the critical perspective of December 5, 1994, when the failure to object now under scrutiny took place, Gross's lawyer had every reason to believe that Gross would follow the only rational defense strategy available to him, to wit, that he would take the stand and testify as he did. Under those circumstances, the evidence as to the DNA PCR "non-exclusion" that came in without objection on December 5 did not in any way compromise the defense. In our assessment of the performance component, we hold that counsel was not deficient for not objecting to evidence that did not hurt Gross in any way but was completely compatible with his version of events.

### F. The Non–Objection of December 5: In Conclusion

Even though we are doing so in that case, we are not suggesting for a moment that an evaluation, under *Strickland v. Washington,* of whether a defendant at his trial received the effective assistance of counsel requires breaking the overall trial performance down into an infinite number of constituent fragments and then evaluating each fragment in a vacuum. It is only because we are reversing the decision of the post-conviction petition hearing judge in this case that we are indulging Gross in such a detailed and fragmented analysis. All that is required is an overall assessment of effectiveness under the totality of the circumstances. *Strickland v. Washington,* 466 U.S. at 695–96, 104 S.Ct. 2052. In this case, however, Gross hits us, as he hit the post-conviction hearing judge, with such a rapid-fire barrage of intertwining conten-

tions of surface plausibility that it is almost impossible to answer the total bombardment without painstakingly pinning the contentions down and then, one by one, looking at them in more tranquil detail.

In looking at the decision of Gross's counsel not to renew his objection to the DNA PCR evidence on December 5, as that decision bears on the overall performance component, we, by way of our independent review of this ultimate and conclusory fact, see no deficiency in that performance.

## THE TWO HYBRID ISSUES:
## THE PREJUDICE COMPONENT AT THE APPELLATE LEVEL

■ With respect to these two sub-issues that we have characterized as hybrid, our consideration of the appellate prejudice component is, fortunately, already 98 percent completed. These two instances of allegedly deficient performance by trial counsel—1) the failure on December 5 to renew the objection to DNA PCR evidence generally and 2) the failure on December 5 to renew the objection to DNA PCR evidence on the specific ground that it was inadmissible without accompanying population genetics statistics—replicate precisely two of the three instances of allegedly deficient performance by appellate counsel. At the appellate level, the allegedly deficient performance was in failing to appeal those two issues. At the trial level, the allegedly deficient performance was in failing to preserve those two issues so that they could be appealed.

■ In order to demonstrate appellate prejudice resulting from trial counsel's failure to preserve these two related sub-issues for appellate review, Gross would have to show, in the words of *Smith v. Robbins*, 528 U.S. at ——, 120 S.Ct. at 764, 145 L.Ed.2d at 780, "a reasonable probability that but for counsel's" failure to preserve the issues for appellate review, "he would have prevailed on his appeal." *State v. Thomas*, 325 Md. 160, 599 A.2d 1171 (1992), was a case where the defendant claimed that trial counsel's failure to preserve an

issue for appellate review constituted ineffective assistance of counsel. In rejecting that claim for the Court of Appeals, 325 Md. at 182, 599 A.2d 1171, Judge Karwacki explained that even if a deficiency with respect to the performance component were assumed, there still must be a showing of appellate prejudice:

> Thomas claims that he was denied his right to effective assistance of counsel because his trial counsel failed to preserve for appellate review the trial court's refusal to strike certain prospective jurors for cause. . . .
>
> *Assuming* that Mr. Kinsley's failure to preserve Thomas's challenges of jurors for cause constituted *deficient performance* sufficient to satisfy the first prong of the *Strickland* test, we hold that *Thomas has failed to satisfy his burden* under the second prong of that test *to demonstrate that his trial counsel's errors prejudiced his defense.*

(Footnote and citation omitted; emphasis supplied).[9]

We have already noted that for a number of sound reasons other than non-preservation, Gross's appellate counsel chose not to raise those issues on appeal. After detailed analysis, we have held, moreover, that Gross's appellate counsel was not ineffective for choosing not to raise those issues on appeal. It follows that there can be no "reasonable probability" of prevailing on issues that, even if preserved, would not have been appealed in any event.

---

**9.** Although the principle for which we have cited *State v. Thomas* has not been affected by subsequent developments in the case, the case itself has had an extended life. The Court of Appeals reversed the ruling of the post-conviction hearing judge, Joseph F. Murphy, Jr., that Thomas was entitled to a new sentencing hearing. It remanded the case to the circuit court for further proceedings. On remand and following another hearing, Judge Murphy again vacated the death penalty and ruled that Thomas was entitled to a new sentencing hearing. For a second time, the Court of Appeals reversed his decision in that regard. *State v. Thomas,* 328 Md. 541, 616 A.2d 365 (1992).

Thomas petitioned for *habeas corpus* relief to the United States District Court, where Judge Frederick Motz ruled that Judge Murphy had been correct in vacating the death penalty. *Thomas–Bey v. Smith,* 869 F.Supp. 1214 (1994). In an unpublished opinion, the United States Court of Appeals for the Fourth Circuit affirmed the decision of Judge Motz. *Thomas–Bey v. Nuth,* 67 F.3d 296 (1995).

Save only for our mention of non-preservation, everything we said and everything we held on the subject of the effectiveness of Gross's appellate counsel, with respect to both the performance component and the prejudice component, compels our present and inextricably related holding that trial counsel's failure to preserve these two sub-issues for appellate review did not result in any possible appellate prejudice.

In evaluating the performance of appellate counsel, we quoted from *Smith v. Robbins,* 528 U.S. 259, ——, 120 S.Ct. 746, 764, 145 L.Ed.2d 756, 782 (2000); *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); and *Oken v. State,* 343 Md. 256, 271, 681 A.2d 30 (1996), for the proposition that, with respect to appellate issues, counsel should engage in a winnowing process, pushing the stronger issues and ignoring the more peripheral issues. We found appellate counsel's performance on direct appeal to have been highly commendable and his choice of appellate issues soundly based. His decision to raise the issues he did on direct appeal and to ignore the DNA-related issues received our complete endorsement.

We examined not only the strength of the appellate issues that were raised but the relative weakness of the appellate issues that were not raised. In that latter regard, what we said about the non-preservation of these two DNA-related sub-issues is, of course, inappropriate to our present analysis. That one factor, which tilted in favor of the effectiveness of appellate counsel, tilts against the effectiveness of trial counsel. That is why we said our earlier consideration of the effectiveness of appellate counsel is only 98 percent dispositive of the present issue of appellate prejudice. We now conclude that our earlier analysis about the effectiveness of appellate counsel would have been exactly the same even without this non-preservation factor.

What we earlier observed about the relative weakness of these two issues on the legal merits—pointing out that the post-conviction hearing judge actually ruled that the trial judge was not in error for deciding these issues as he did—has

equal pertinence here. What we earlier observed about the relative weakness of these two issues because of their immateriality—they did not harm Gross because they were not at odds with his trial testimony—has equal pertinence here.

Everything that we earlier said and held with respect to the prejudice component of the appellate effectiveness issue is equally pertinent here. We there pointed out that the post-conviction hearing judge found both rulings by the trial judge to have been free from error and that there is no appellate prejudice in not appealing a loser. That is equally foreclosing about the failure to preserve a loser for appellate review. We there said that had the issues been before us on direct appeal, we would not have found reversible error with respect to either of them. That this is the ultimate test of appellate prejudice was made very clear by *State v. Thomas,* 325 Md. at 182, 599 A.2d 1171, where Judge Karwacki pointed out the issue before the Court:

> Thomas alleges that had this Court reached the jury selection issues raised on Thomas's direct appeal, *there is a reasonable probability that we would have reversed his convictions.*

(Emphasis supplied). In answering that question in the negative, the Court of Appeals, 325 Md. at 188, 599 A.2d 1171, reviewed that issue, hypothetically before it, and concluded that it would not have "reversed his convictions":

> In sum, a review of Thomas's complaints levied against the two jurors who served reflects *no showing of an abuse of discretion* by the trial judge *that would have resulted in a reversal of his convictions on direct appeal.*

(Emphasis supplied). That conclusion is absolutely dispositive of the closely-related appellate prejudice component now under review. If the issues would not have prevailed on appeal, even had they been preserved and raised, there was self-evidently no prejudice in failing to preserve them for appellate review.

When trial counsel on December 5 failed to renew his earlier objection to the DNA PCR evidence, he failed to

preserve two sub-issues for appellate review. Neither of those sub-issues would have been raised on appeal, even if they had been preserved. Neither of those sub-issues would have prevailed on appeal, even if they had been preserved and raised. Self-evidently, no appellate prejudice resulted from this allegedly deficient performance by of trial counsel.

## INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Of the seven instances the post-conviction hearing judge cites of ineffective assistance of counsel, only one retains the classic configuration of an allegedly deficient performance by trial counsel leading to alleged prejudice when it comes to the trial verdict. The hearing judge, *inter alia,* found that trial counsel failed "to investigate, hire, and properly prepare a qualified, competent expert in the field of DNA PCR testing." The expert with respect to whom that finding was made was Dr. Walter Rowe.

As to Dr. Rowe, the hearing judge found:

This Court finds that O'Neill's performance was deficient in that he did not thoroughly investigate Rowe's credentials. Had he done so, he would have discovered that Rowe was not qualified to testify as an expert on DNA PCR evidence. While Rowe may be qualified in other areas, the evidence was clear that he was not qualified to testify about PCR testing. Had O'Neill properly questioned Rowe in the hiring process, based on the results of that interview, he presumably would have conducted a search for a qualified expert. At the very least, O'Neill should have requested a postponement when Rowe was found not to be qualified as an expert in order to find another doctor who would qualify.

## 1. Trial Counsel: The Performance Component

 In making our evaluation of trial counsel's performance in allegedly not investigating sufficiently Dr. Rowe's credentials, we bear in mind the admonition of *Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. 2052:

> In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying *a heavy measure of deference to counsel's judgments.*

(Emphasis supplied).

### a. The Hiring and Utilization of Dr. Rowe Generally

After thoroughly reviewing the transcript of the post-conviction hearing, we conclude that Gross's trial counsel did a highly professional job in hiring and utilizing a variety of expert witnesses in order to prepare the defense for every contingency. Counsel utilized two private investigators to assist in interviewing witnesses. He personally interviewed the doctor who did the post-mortem autopsy. He contracted with his own independent expert to confirm or deny what had been found by the State's fingerprint analysis. He similarly hired an expert to confirm or deny the State's ballistics report. He hired a Dr. Shapiro to do a psychological work-up of Gross. He hired a polygraph examiner to do a polygraph analysis of Gross. (This was apparently successful in persuading the State's Attorney for Anne Arundel County to take the death penalty off the table).

Dr. Rowe was hired for a number of purposes, one of which was to serve as the defense expert on the hair and fiber analysis that was performed by the FBI laboratory. Dr. Rowe was also to function as the defense expert on DNA PCR evidence, as well as to educate the defense legal team on the entire science of DNA identification. Counsel also hired a Dr. McClintock as a backup to Dr. Rowe on the subject of DNA analysis. With respect both to Dr. Rowe and Dr. McClintock, defense counsel initially contacted the Death Penalty Unit of the Public Defender's Office and spoke with the head of that unit, Tom Saunders. It was through Mr. Saunders that counsel learned the names of Dr. Rowe and Dr. McClintock.

With respect to the general admissibility of DNA PCR evidence, neither Dr. Rowe nor Dr. McClintock were put on the stand at the hearing on the Motion *in Limine* to contest

that evidence. Counsel made it clear, at the subsequent post-conviction hearing, that he did not expect to prevail on that issue but nonetheless chose to put the State, as the proponent of the evidence, through its paces. He also testified at that hearing that both Dr. Rowe and Dr. McClintock had indicated to him that in their opinion, DNA PCR evidence was generally accepted in the scientific community. Master Cynthia Ferris, who had been the prosecutor at Gross's trial, explained at the post-conviction hearing that in 1994 the number of competent expert witnesses in the area of PCR DNA evidence was "extremely limited." No one, including the expert who testified for Gross at the post-conviction hearing, Dr. Theodore Kessis, ever testified that there was a single expert anywhere in the United States in 1994 who would have testified that DNA PCR evidence was not generally acceptable in the scientific community.

With respect to the ability of Dr. Rowe to qualify as an expert in the field of DNA, Dr. Rowe had informed counsel that "he had qualified on four occasions as an expert in the field of DNA." On his *voir dire* examination at the hearing on the Motion *in Limine*, Dr. Rowe stated that in addition to having testified as a DNA expert in Minnesota and California, he had testified at *Frye-Reed* hearings concerning DNA evidence in Maryland, including specifically the two cases that ultimately were reported as *Cobey v. State*, 80 Md.App. 31, 559 A.2d 391 (1989) and *Yorke v. State*, 315 Md. 578, 556 A.2d 230 (1989). At the post-conviction hearing, counsel explained why he relied on Dr. Rowe as a qualified expert:

He indicated to us that he taught at George Washington University on the subject of DNA, that he had qualified as an expert in other fields repeatedly, that he had attended seminars, that he had sufficient knowledge and information as an expert to be able to testify as an expert. I had no reason to doubt him. No reason to believe that he wasn't qualified, especially in light of the fact that *his name was provided to us by the Death Penalty Unit* and *they,* to the best of my knowledge, *had used him before. It's my*

*understanding he, today, testifies as an expert in the field of DNA.*

(Emphasis supplied).

Under cross-examination, Gross's counsel went on:

Dr. McClintock had direct experience dealing with ... both PCR and RFLP in a laboratory setting. He had worked for the National Institute of Health.... *Dr. Rowe* is a graduate of Harvard University. He's a very bright man. He's a teacher, he's a professor at George Washington University where he's taught for over nineteen years at the time.... *[T]his man is representing to me that he's qualified to give his opinion as an expert. He represents to me that he's testified as an expert before on this subject. I had no reason to doubt that he was not an expert in this area.*

Q: *Qualified to testify as an expert on DNA PCR or DNA RFLP?*

A: *Well, both.*

(Emphasis supplied).

Part of the function of Dr. Rowe was to educate the defense legal team on the arcane subject of DNA identification (a quandary with which we can empathize). In that capacity, he not only performed his teaching assignment with the defense lawyers, but he traveled with them to the Cellmark Diagnostic Laboratory, so that they could check out the DNA results for themselves. At least half a day was spent in a meeting room rented for the occasion at a Holiday Inn adjacent to the Cellmark facility. Dr. Rowe was present not only for the interview with Dr. Charlotte Word but also for the interview with Melissa Weber, who would be the State's primary expert. It turned out that Melissa Weber was one of Dr. Rowe's students before she received her Master's Degree from his department. With respect to the trip to Cellmark Laboratory, Gross's counsel testified:

In regard to Dr. Rowe, did you receive the complete file from Cellmark?

A: To the best of my knowledge we did.

Q: And the protocols and everything of that nature?

A: Yes, ma'am.

Q: Okay. *And did you have Dr. Rowe review those?*

A: Not only did we have Dr. Rowe those, I mean, *Dr. Rowe . . . came with us to Cellmark* when we met with their expert, and *Dr. Rowe knew Melissa Weber because Melissa Weber was one of his students* so . . . he was able to converse with her directly about this . . . situation because he had a relationship that he had developed with her.

Q: *And did you also meet with Dr. Word at Cellmark?*

A: *Yes.*

Q: *And Dr. Rowe was in the presence of that entire meeting?*

A: *Yes, he was.*

Q: And that took a couple hours. Correct?

A: Yes, ma'am.

(Emphasis supplied).

Counsel also testified that he had Dr. McClintock review the file from Cellmark Diagnostic. Neither Dr. Rowe nor Dr. McClintock found any evidence of contamination in the analysis performed by Cellmark. The motion to oppose the receipt of DNA PCR evidence generally, moreover, was purely *pro forma.* With respect to the Motion *in Limine* as it challenged the DNA PCR evidence generally, both Dr. Rowe and Dr. McClintock believed that DNA PCR evidence was generally accepted in the scientific community. Whether they were offered or qualified as experts on DNA PCR evidence generally is beside the point, for there was nothing to which they would have testified that would have been helpful to the defense. Gross's counsel was not surprised that that was the case.

On our independent review of the entire record as it applies to the hiring and utilization of Drs. Rowe and McClintock, we see nothing that would persuade us that, in the words of *Strickland v. Washington,* "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104

S.Ct. 2052. It was not, in the words of *Gilliam v. State*, 331 Md. at 665–66, 629 A.2d 685, "outside the wide range of professionally competent assistance."

### b. Dr. Rowe and Population Genetics Statistics

At the combined hearing of November 29, 1994 on the Motions *in Limine*, the primary thrust of Gross's attack was on the relevance of DNA evidence in the absence of interpretive population genetics statistics. It was with respect to that area of attack that the post-conviction hearing judge found specifically that trial counsel's performance was deficient:

> If O'Neill had hired a competent expert, *there is a possibility that an expert would have testified that without the population genetic statistics, the results of the DNA PCR testing are meaningless* to the jury because they would have no basis upon which to interpret the results.

(Emphasis supplied). The hearing judge believed that the failure of Dr. Rowe to be accepted as a DNA expert doomed Gross's chances of success on this issue:

> [T]his Court believes that *had O'Neill hired a qualified expert* to testify on Petitioner's behalf, *the expert may well have been able to argue* to Judge Williams at the first motion *in limine that the DNA results should not be admitted* without the population genetic statistics.

(Emphasis supplied).

As we review the transcript from the original hearing on the Motion *in Limine*, however, it appears that Dr. Rowe testified fully and completely on this subject. To be sure, he was not accepted as an expert on DNA PCR analysis. He was, however, accepted as an expert on forensic serology. In that capacity, he testified without limitation on the subject of population genetics statistics. On his *voir dire* examination, he explained that frequency calculations in forensic serology (blood type comparisons) are no different from frequency calculations with respect to DNA PCR testing:

> *Frequency calculations that are used in these cases [DNA] are the same kind of frequency calculations that*

*have been used in forensic serology since forensic serology began.* I was originally trained as a forensic serologist, and trained in the interpretation of genetic marker analysis results. . . . I have continued to do those kinds of interpretations. I have done serological testing of the same type over the many years that I've been a faculty member at George Washington University. I teach the interpretation of this kind of genetic marker analysis data, routinely, not only in survey courses, but also in in-depth courses in the field of forensic science.

Q: All right. *So frequency calculations are not something that's simply limited to the testing in PCR testing, but . . . it goes along with many other studies. Is that correct?*

A: *That's correct.*

(Emphasis supplied).

The trial judge first accepted Dr. Rowe as an expert on frequency calculations as a forensic serologist:

Court: *I'll let him testify as a forensic serologist . . .*

. . .

Court: *. . . on frequency calculations.*

(Emphasis supplied). He then ruled that he would permit him to offer his expert opinion on frequency calculations with respect to DNA as well:

Court: Well, *I'll let him do the DNA . . . [because] he said it's the same calculation.*

(Emphasis supplied).

In the last analysis, Dr. Rowe testified wearing Expert Hat "B" instead of wearing Expert Hat "A." Regardless of which Expert Hat he was wearing, his expert testimony was precisely the same. His opinion was that the DNA PCR analysis of a mere "non-exclusion" "could include thousands of individuals." With specific reliance on Dr. Rowe's expert testimony, Gross's counsel, in final argument before the trial judge, argued that "the results are meaningless." On that critical issue, Dr. Rowe's expert testimony never missed a beat. In choosing and using Dr. Rowe as his expert, moreover, in no way can it

be held that trial counsel did not provide "reasonably effective assistance" or that trial "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland v. Washington,* 466 U.S. at 687–88, 104 S.Ct. 2052. Counsel's conduct did not constitute what *Oken v. State* characterized as "unreasonable professional judgment." 343 Md. at 283, 681 A.2d 30.

### c. The Failure to Request a Postponement

Notwithstanding the fact that the attack on DNA PCR evidence generally was only *pro forma,* the post-conviction hearing judge was of the opinion that, when Dr. Rowe failed to qualify as an expert in that regard, trial counsel should have sought a postponement and launched a search for another expert who might qualify in that regard:

> At the very least, O'Neill should have requested a postponement when Rowe was found not to be qualified as an expert in order to find another doctor who would qualify.

At the post-conviction hearing, however, trial counsel made it clear that there was no point in further pursuing such a will o' the wisp. Neither Dr. Rowe nor Dr. McClintock, even had they qualified as experts, were going to testify that DNA PCR evidence did not satisfy the *Frye-Reed* test, nor apparently was anyone else in the country available to testify to that effect.

In yet another respect, there was no point in pursuing such an exercise in futility. It had already been determined by the defense team that Gross was going to testify and to acknowledge having had sexual intercourse with Peggy Courson. The DNA evidence would have had no possible adverse effect on the defense. It would, however, have cost Gross's already overextended family an additional and totally unnecessary expense. As counsel testified:

> *We knew Alvin was going to say that he had relations with her.* So I wasn't going to spend—I mean, *that family, they spent a fortune on this young man.* We had hired a ballistics expert, we hired an expert to do the fingerprints,

we had hired a psychologist, we had hired an expert to analyze obviously the DNA, Dr. McClintock, and *it got to a point where quite frankly I didn't think that was an issue that I would have spent more money on.*

(Emphasis supplied). As *Strickland v. Washington* reminds us, 466 U.S. at 691, 104 S.Ct. 2052, in assessing "a particular decision not to investigate," we must "apply a heavy measure of deference to counsel's judgments."

In this case, moreover, there had not even been a failure to investigate. Gross's trial counsel obtained from Dr. Rowe and from Dr. McClintock everything that he ever realistically expected to obtain from them. With respect to some alleged deficiency on his part in failing to seek a postponement so that he could search out and procure some other opinion from some other expert, we feel in this case as we did in *Cirincione v. State,* 119 Md.App. at 493, 705 A.2d 96:

> *Trial counsel investigated and procured* the *thoroughly adequate expert opinions* of Drs. Spodak and Richmond, and *his valid decision not to investigate the similar opinions of other experts is not* rendered *infirm* by the potential for a death penalty. In sum, having made a valid decision to rely on particular experts for the necessary testimony at trial, *counsel was under no constitutional duty to conduct further investigations into the potential testimony of other experts.* The decision not to investigate resulted in no deficiency of representation and no prejudice to appellant, and appellant was not denied effective assistance of counsel thereby.

(Emphasis supplied). *See also* Gilliam v. State, 331 Md. 651, 671, 629 A.2d 685 (1993). *And see Burger v. Kemp,* 483 U.S. 776, 794–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

## 2. Trial Counsel: The Prejudice Component

██ From the use of Dr. Walter Rowe as its DNA expert to the exclusion of other possible DNA experts, the defense in this case suffered no trial prejudice. The State's satisfying of the *Frye-Reed* test for the admissibility of DNA PCR evidence was virtually a foregone conclusion. As *Armstead v. State,*

342 Md. at 53 n. 9, 673 A.2d 221, predicted, the discernible trend was in favor of the acceptance of DNA PCR evidence. It has today been accepted by every jurisdiction which has ruled on the question. In that regard, Gross suffered no prejudice.

With respect to the denial of the Motion *in Limine* based on the alleged irrelevance of DNA PCR evidence of "non-exclusion" in the absence of supporting population genetics statistics, the trial judge's decision properly went against Gross. The prevailing law at the time was *Jackson v. State*, 92 Md.App. at 324, 608 A.2d 782, which held that the State had no need to offer the interpretive statistics as a precondition to evidentiary admissibility. In an effort to counter that ruling, however, Dr. Rowe was offered as an expert. In an expert capacity, he testified fully and completely as to the lack of probative value of any DNA identification offered in the absence of such statistics. From his use as opposed to the use of some other expert, Gross suffered no prejudice.

As peripheral evidence that Gross had been in sexual contact with his victim, moreover, Gross suffered no prejudice from the use of the evidence. Other evidence of his involvement with the victim, both indisputable physical evidence and his own admissions to a close friend, was overwhelming and the equivocal DNA "non-exclusion" added almost nothing in that regard.

In the last analysis, Gross suffered no prejudice from his reliance on Dr. Rowe as his expert because the State's use of the DNA "non-exclusion" did not harm Gross's defense in any way. As we have fully discussed, it was strategically imperative that he take the stand to give his version of his undeniable contact with the victim. He testified to having had sexual intercourse with her within a period of twenty-four hours prior to her death. The DNA evidence was fully compatible with that version of events. In no possible way was Gross prejudiced in terms of the trial result by his use of Dr. Rowe as his expert. It cannot be said that it "actually had an adverse

effect on the defense." *Strickland v. Washington,* 466 U.S. at 693, 104 S.Ct. 2052.

## IN CONCLUSION

Our holding with respect to Gross's direct appeal is the product of three two-pronged sub-holdings. As a result of our independent constitutional appraisal of the ultimate, conclusory questions, we hold 1)(a) that trial counsel's performance in choosing and using an expert witness was not deficient and (b) that even if, *arguendo,* it were assumed to have been, it did not "so undermine the proper functioning of the adversarial process that the trial [could] not be relied on as having produced a just result;" 2)(a) that trial counsel's performance in not preserving two issues for appeal was not deficient, and (b) that even if, *arguendo,* it were assumed to have been, there was no "reasonable probability" or "substantial possibility" that, but for such failure, Gross "would have prevailed on his appeal;" and 3)(a) that appellate counsel's performance in not appealing three issues was not deficient and (b) that even if, *arguendo,* it were assumed to have been, there was no "reasonable probability" or "substantial possibility" that, but for such failure, Gross "would have prevailed on his appeal." From these three sub-holdings proceeds our ultimate holding that Gross was not denied his Sixth Amendment right to the effective assistance of counsel.

Accordingly, we reverse the judgment of the post-conviction hearing judge that Gross suffered such a constitutional denial and the consequential order that Gross be awarded 1) a new trial or 2) in lieu of a new trial, a new appeal.

## ADDENDUM

One additional issue remains before us for resolution. At the post-conviction hearing, the hearing judge granted relief to Gross with respect to some of his contentions, and the State's Application for Leave to Appeal was based on that grant of relief. With respect to several other contentions raised by Gross, however, the post-conviction hearing judge

denied relief, and Gross filed a Conditional Application for Leave to Appeal from that denial, conditioned on the eventuality that we might reverse the grant of relief on the first set of contentions. Rather than subject the case to a series of protracted procedural complications, counsel both for the State and for Gross commendably agreed that the State would include in its initial brief the issue raised by Gross in the Conditional Application for Leave to Appeal and would respond to it as if it had already been raised. In its appellant's brief, the State did just that and Gross, in his appellee's brief, "responded" by pressing the argument. In reply brief, the State responded to that "response" and the issue was addressed before us at oral argument. The contention is properly before us.

The contention involves the State's cross-examination of four character witnesses presented by the defense. Edwin Plater testified that Gross was "a good person," "straightforward," and "honest." April Muller testified that Gross had a good reputation and was not violent. Carl Butler testified that Gross's reputation in the community was good and that he had never known Gross to be violent. Erica Estep testified that Gross had many friends, was popular, and was an honest person.

The State on cross-examination probed all four character witnesses by asking whether their opinions would be different if they had known 1) that shortly after the murder, several people had seen Gross with a gun; 2) that Gross had been heard to say such things as "this gun has a life on it;" and 3) that Gross had admitted to a friend that he had shot a woman. All four character witnesses responded unequivocally that their good opinion of Gross would not change.

Gross's contention is that it was legal error for the State to have been permitted to pose "guilt assuming" questions. Gross cites no Maryland case law, and we know of none, prohibiting such questions or even dealing with the subject of "guilt assuming" questions. The controlling Maryland law on this evidentiary issue is Md. Rule 5–405, which provides:

(a) **Reputation or opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) **Specific instances of conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of relevant specific instances of that person's conduct.

 Gross's contention that it is improper to permit "guilt assuming" questions is based exclusively on federal case law. Although the federal case law is persuasive on the Maryland courts, it is no more than that. The law of evidence is traditionally a matter of State law and although we may be persuaded by what sister jurisdictions do in implementing evidentiary provisions similar to our own, we are by no means bound to follow suit. For our present purpose of assessing the adequacy of trial counsel's performance, we hold that the failure to anticipate a possible change in the local law of evidence or to push for such a change is not an instance of "counsel's representation [falling] below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 688, 104 S.Ct. 2052. Gross does not suggest how far he would have counsel go. The evidence law of the 10 th Circuit may, indeed, be persuasive, but so is the evidence law of Idaho and of New South Wales.

 Under the prevailing Maryland evidence law as of the time of trial and as of this writing, nothing objectionable was done in the course of the cross-examinations in question and counsel was, therefore, under no obligation to lodge objections. We will assume, for the sake of argument, that the evidentiary nuance urged by Gross and reflected in the federal case law is the wave of the future. The *Strickland v. Washington* "measure of attorney performance," however, "remains simply reasonableness under prevailing professional norms." 466 U.S. at 688, 104 S.Ct. 2052. The prevailing professional norm has

never required anticipating a change in the law based upon the persuasive influence of sister jurisdictions.

The post-conviction hearing judge reached essentially this same conclusion in finding that it might have been "the better course of action to object," but also finding that the failure to do so did not represent a deficient performance by trial counsel:

> The Court finds that the State's questions of the four defense witnesses were guilt assuming questions, and that *although it would have been the better course of action to object, the failure to do so under these circumstances did not amount to a deficient performance.*

(Footnote omitted; emphasis supplied). Counsel for Gross attempts to set the bar unrealistically high. He would, in effect, make "A plus," or at the very least a straight "A," the passing grade for criminal defense attorneys. Such a lofty standard has never been demanded by the due process clause.

The post-conviction hearing judge's finding was that there was no deficiency in the performance prong of trial counsel's representation. We affirm that ruling. For that reason alone, there was no merit to Gross's claim of ineffective assistance of counsel in that regard.

By way of fortifying that conclusion, we further note that, even if one were to assume deficient performance by trial counsel, there was still no prejudice flowing from that assumed deficiency. For that second and independent reason, there was, *a fortiori*, no merit to Gross's claim of ineffective assistance. Gross actually presents us with a double-barreled claim of prejudice, arguing 1) that the failure to object had a probably adverse effect on the trial verdict and 2) that the failure to object resulted in the issue's not being preserved for appellate review. We must look at those distinct claims of prejudice independently.

Four character witnesses were cross-examined by the State in the manner now challenged by Gross. When the first such witness was asked "guilt assuming" questions, Gross objected and the objection was overruled. When the second witness

was thus cross-examined, Gross initially objected but then withdrew the objection. With respect to the third and fourth witnesses, no objections were lodged.

In terms of possible trial prejudice, we see no reasonable probability that the trial result would have been different if objections had been made with respect to the last three of those witnesses. The trial judge had just overruled the objection when made with respect to the first witness and the issue was identical with respect to the next three witnesses. There was no reasonable likelihood that the ruling would not have been precisely the same even if objections had been made when the issue just ruled upon came up again for a second, a third, and a fourth time.

In terms of appellate prejudice, the issue was preserved for appellate review by way of the timely objection on the record to the cross-examination of the first witness. That was enough to bring this evidentiary issue to the attention of an appellate court had appellate counsel chosen to do so, and there was nothing to be gained by preserving the already preserved issue for a second, a third, and a fourth time. The issue was preserved if anyone chose to pursue it. With respect to this last contention, the post-conviction hearing judge was not in error.

*JUDGMENT GRANTING A NEW TRIAL OR, IN THE ALTERNATIVE, A NEW APPEAL REVERSED; COSTS TO BE PAID BY APPELLEE.*